Argued and submitted February 23, judgment of conviction and sentence of death affirmed June 17, 1993

## STATE OF OREGON,
*Respondent,*

*v.*

## JESSE CLARENCE PRATT,
*Appellant.*

## (CC 86-00328-CR; SC S38102)

853 P2d 827

Stephen J. Williams, Deputy Public Defender, Salem, argued the cause and filed the briefs for appellant. With him on the briefs were Sally L. Avera, Public Defender, and Diane L. Alessi, Deputy Public Defender, Salem.

Virginia L. Linder, Solicitor General, and Brenda J Peterson, Assistant Attorney General, Salem, argued the cause and filed the briefs for respondent. With them on the briefs were Theodore R. Kulongoski, Attorney General, and Timothy A. Sylwester, Assistant Attorney General, Salem.

Michael D. Schrunk, Multnomah County District Attorney, John C. Bradley, Deputy District Attorney, and David L. Hattrick, Deputy District Attorney, Portland, filed a brief for *amicus curiae* Michael D. Schrunk, Multnomah County District Attorney.

Tom Ryan, Portland, and Hubert Duvall, Jr., Eugene, filed a brief for *amicus curiae* Oregon Criminal Defense Lawyers Association.

GILLETTE, J.

Fadeley, J., dissented and filed an opinion.

### GILLETTE, J.

This criminal case is before this court on automatic and direct review of a judgment of conviction and sentence of death for two counts of aggravated murder. It is the second time that the case has been before us. This court previously reversed defendant's initial conviction and sentence of death and remanded for a new trial. *State v. Pratt*, 309 Or 205, 785 P2d 350 (1990). On retrial, defendant again was convicted on two counts of aggravated murder and sentenced to death. On this second appeal, defendant assigns a total of 20 errors that allegedly occurred during the guilt and penalty phases of the trial. Defendant and the state also have briefed and argued a question of whether the indictment in this case was properly handed down, where fewer than seven grand jurors considered the case and handed down the indictment. We affirm the judgment of conviction and the sentence of death.

### FACTUAL SUMMARY

Defendant was charged with two counts of aggravated murder in the death of Carrie Love. One count alleged that defendant murdered Love in the course of attempting to rape her; the second count alleged that he murdered her in the course of maiming her.[1]

---

[1] ORS 163.095 provides:

"As used in * * * this section, 'aggravated murder' means murder as defined in ORS 163.115 which is committed under, or accompanied by, any of the following circumstances:

"(1) * * *

"* * * * *

"(e) The homicide occurred in the course of or as a result of intentional maiming or torture of the victim.

"(2) * * *

"* * * * *

"(d) Notwithstanding ORS 163.115 (1)(b), the defendant personally and intentionally committed the homicide under the circumstances set forth in 163.115 (1)(b)."

At the time of the alleged crime, ORS 163.115(1) (1986) provided:

"Except as provided in ORS 163.118 and 163.125, criminal homicide constitutes murder when:

"* * * * *

"(b) It is committed by a person, acting either alone or with one or more persons, who commits or attempts to commit any of the following crimes and in the course of and in furtherance of the crime the person is committing or

The jury could have found the following facts. *See State v. Tucker*, 315 Or 321, 325, 845 P2d 904 (1993) ("Because the jury found defendant guilty, we view the evidence in the light most favorable to the state."). Defendant owned and operated a trucking company in Seattle. Love, who was one of defendant's employees, agreed to accompany defendant in his truck on a trip to Los Angeles to open a new office. Love was concerned that defendant might make sexual advances toward her during the trip, but she told her boyfriend that, if defendant did make such advances, she would get out of the truck and call her boyfriend.

Defendant and Love left Seattle on June 16, 1986. On June 17, a passerby discovered a sleeping bag and a pillowcase in a ditch beside Highway 97 north of Klamath Falls. The pillowcase contained Love's purse and identification. The passerby turned the items over to the Oregon State Police. The next day, the police found Love's nude body at a truck turnout along Highway 97 south of the location where her purse was found. Love had been stabbed, asphyxiated, and run over by a vehicle.

On June 19, defendant telephoned his office in Seattle while an Oregon State Police officer was present. Defendant told the officer that he was on his way to Phoenix. The Oregon State Police sent a teletype message to police agencies in the western states requesting that defendant be arrested and his truck seized. Later that day, defendant was stopped and arrested by the Arizona Highway Patrol.

Following a jury trial in early 1988, defendant was convicted on both counts of aggravated murder and sentenced to death. On automatic review, this court reversed defendant's conviction and sentence and ordered a new trial, because the guilt phase of the first trial was tainted by prejudicial evidence of a prior crime. *State v. Pratt, supra.* On

attempting to commit, or during the immediate flight therefrom, the person, or another participant if there be any, causes the death of a person other than one of the participants:

"* * * * *

"(H) Any felony sexual offense in the first degree as defined in this chapter[.]"

Rape in the first degree was and continues to be a felony offense defined in chapter 163. ORS 163.375.

retrial, defendant again was convicted on both counts and sentenced to death. This automatic appeal followed.

## GRAND JURY ISSUE

**1.** We discuss first the question raised by the parties concerning the number of grand jurors who indicted defendant. While this case was awaiting oral argument in this court, the Court of Appeals, sitting in banc, decided *Goodwin v. State of Oregon*, 116 Or App 279, 840 P2d 1372 (1992). In *Goodwin*, a post-conviction relief case, a six-member majority of the Court of Appeals held that, when a person is indicted for a crime, Article VII (Amended), section 5(2), of the Oregon Constitution,[2] "mandates that seven grand jurors hear and consider all of the evidence presented before a valid indictment can be found." 116 Or App at 283. The majority in *Goodwin* concluded that, "[b]ecause only six grand jurors heard the evidence in petitioner's case, he was entitled to dismissal of the indictment." *Id.* at 284.

Following the *Goodwin* decision, the parties in this case discovered that only six grand jurors were in attendance when the grand jury indicted defendant on the two counts of aggravated murder at issue here.[3] Thus, the rationale of the *Goodwin* decision — if that decision was correct — would call for dismissal of the indictment in the present case. Consequently, the parties filed a joint motion asking this court to determine that issue. We conclude, however, that we cannot reach the issue in this case, because the issue was not raised in a timely manner.

As noted, defendant previously was tried and convicted under the present indictment. This appeal arises out of his conviction following retrial. At no time before the briefing

---

[2] Article VII (Amended), section 5(2), of the Oregon Constitution, provides: "A grand jury shall consist of seven jurors chosen by lot from the whole number of jurors in attendance at the court, five of whom must concur to find an indictment."

[3] Defendant was indicted by a grand jury in Klamath County on July 1, 1986. The deputy district attorney who presented the evidence to the grand jury in this case has sworn in an affidavit that the grand jury "was duly impaneled according to law, with seven people selected to serve as jurors." According to the district attorney, however, the grand jury did not thereafter always work with all seven members present. Only six grand jurors were present on July 1, 1986, the seventh having been excused for June 30 and July 1 for work-related reasons. We accept the foregoing recitation of facts as being correct for the purposes of this appeal.

in the present appeal did defendant raise any challenge concerning the qualifications of the grand jury that indicted him. We think that such a challenge now comes much too late.

Procedures for attacking the sufficiency of an indictment are provided in ORS chapter 135. They are: (1) a motion to set aside an indictment, ORS 135.510, and (2) a demurrer, ORS 135.610. With two exceptions concerning a demurrer that are not pertinent to our inquiry in this case, either a motion to set aside an indictment or a demurrer must be filed before trial. *See* ORS 135.520 (motion to set aside indictment "shall be made and heard at the time of the arraignment or within 10 days thereafter, unless for good cause the court allows additional time"); ORS 135.610 (demurrer "shall be entered either at the time of the arraignment or at such other time as may be allowed to the defendant for that purpose").

An assertion that fewer than the requisite number of grand jurors participated in handing down an indictment is specifically identified as a ground for a motion to set aside an indictment. ORS 135.510(1)(a) provides:

"(1)   The indictment shall be set aside by the court upon the motion of the defendant in either of the following cases:

"(a)   When it is not found, indorsed and presented as prescribed in ORS *132.360*, 132.400 to 132.430 and 132.580."

(Emphasis supplied.) ORS 132.360 provides:

"A grand jury may indict or present facts to the court for instruction as provided in ORS 132.370, with the concurrence of five of its members, if at least five jurors voting for indictment or presentment heard all the testimony relating to the person indicted or facts presented."

It is true that the foregoing statutes do not speak to a challenge based on a *constitutionally*, rather than a *statutorily*, inadequate number of grand jurors. However, we think that the parallel between the latter kind of contention and the former is so complete that ORS 135.510(1)(a) should be deemed to apply equally to both kinds of challenges. It is obvious that defendant's challenge to the grand jury vote in this case came far later (by many years) than the time in which it had to be brought under ORS 135.510(1)(a) and 135.520. Any right that defendant may have had to have the

indictment set aside — and we express no opinion on that question — had to be exercised in a timely manner under those statutes. Defendant's failure to make a timely motion to set aside the indictment precludes this court from considering the grand jury issue further. *See* ORS 135.520 (if a motion to set aside the indictment is not made within the time required, "the defendant is precluded from afterwards taking the objections to the indictment"). Therefore, we proceed to a review of defendant's appeal on the merits.

## PRETRIAL MOTIONS

### *Suppression of Evidence*

■ Before trial, defendant moved to suppress all physical evidence and all statements obtained after his arrest in Arizona, on the ground that that arrest was unlawful. The trial court denied the motion, and defendant assigns that ruling as error. Defendant argues that his arrest was unlawful, because the Oregon State Police did not obtain an arrest warrant before defendant was arrested in a public place by the Arizona Highway Patrol, even though there was sufficient time to do so. Because we decided that question adversely to defendant on his first appeal, we conclude that the trial court committed no error in denying defendant's motion.

Before his first trial, defendant sought to suppress the same evidence that is the subject of the present motion. At that time, he argued that his arrest was unlawful because the arresting officer in Arizona lacked a reasonable belief that the Oregon State Police had information sufficient to establish probable cause for the arrest. On review of the trial court's denial of that earlier motion, this court held that the Arizona officer's reliance upon a teletype message requesting defendant's arrest was reasonable. *State v. Pratt, supra,* 309 Or at 216-17. In a footnote, however, the court noted:

> "We do not decide whether a warrantless arrest is still appropriate when there has been sufficient time to obtain a warrant. It may well be that the failure of police to obtain a warrant promptly when they have time to do so would invalidate an otherwise valid warrantless arrest. *That issue is not presented by this case because a warrant was obtained not long after the teletype was sent out*, and, in any case, defendant has not raised the issue."

*Id.* at 217 n 9 (emphasis supplied).

Defendant has failed to understand the full import of that footnote. In that footnote, while acknowledging that some future case possibly might present the issue whether an otherwise valid warrantless arrest could be invalid because the police had failed to obtain an arrest warrant when there was sufficient time to do so, this court also expressly stated that it did not find the problem to be presented by the case at hand "because a warrant was obtained not long after the teletype was sent out." *State v. Pratt, supra,* 309 Or at 217 n 9.

The doctrine of "the law of the case" precludes this court from reconsidering that decision:

> "It is a general principle of law and one well recognized in this state that when a ruling or decision has been once made in a particular case by an appellate court, while it may be overruled in other cases, it is binding and conclusive both upon the inferior court in any further steps or proceedings in the same litigation and upon the appellate court itself in any subsequent appeal or other proceeding for review."

*Simmons v. Wash. F. N. Ins. Co.,* 140 Or 164, 166, 13 P2d 366 (1932); *see also State v. Keelen,* 106 Or 331, 336, 211 P 924 (1923) (applying doctrine of "law of the case" in a criminal case). The trial court did not err in denying defendant's motion to suppress.

### Change of Venue

Before jury selection began, defendant moved for a change of venue pursuant to ORS 131.355.[4] The court denied the motion, and defendant assigns that ruling as error.[5] Defendant contends that "there was a reasonable likelihood that any jury selected in Klamath County would not be free

---

[4] ORS 131.355 provides:

"The court, upon motion of the defendant, shall order the place of trial to be changed to another county if the court is satisfied that there exists in the county where the action is commenced so great a prejudice against the defendant that the defendant cannot obtain a fair and impartial trial."

[5] Defendant renewed his motion for change of venue during jury selection, and the court denied it again. Defendant also assigns that ruling as error. We address the renewed motion below, along with the court's denial of defendant's motion for additional peremptory challenges.

from outside influences," and that, as a result, it was impossible for him to obtain a fair and impartial trial in that county.[6] A recitation of the evidence involved would not benefit bench or bar. This court reviews denial of such motions for abuse of discretion. *State v. Langley*, 314 Or 247, 260, 839 P2d 692 (1992). We conclude that the court did not abuse its discretion in this case.

## GUILT·PHASE
## ASSIGNMENTS OF ERROR

### Impeachment Evidence

During its case-in-chief, the state called as a witness Danny Randolph, who testified about incriminating statements that defendant allegedly had made to Randolph while they were incarcerated together in the Klamath County Jail. On direct examination, Randolph testified that he had been convicted of more than one felony. On cross-examination, the defense elicited further details regarding Randolph's convictions in order to impeach his testimony:

"Q. Mr. Pratt, or I mean Mr. uh, Randolph, you said that you have been convicted of uh, several felonies. Are you convicted on uh, June twelfth, 1979 in Missouri of a robbery?

"A. Yes.

"Q. And were you convicted in uh, also of a burglary in second degree in uh, August the thirtieth, 1979?

"A. Yes I was.

"Q. Were you also convicted of [the] charge of stealing from a person?

"A. Yes I was.

"Q. Are you [the] same Danny Randolph that was convicted in Klamath County * * * of a theft in the first degree count one, ex-convict in possession of firearm count two?

"A. Yes I am."

---

[6] In addition to citing ORS 131.355, defendant also relies on Article I, section 11, of the Oregon Constitution, and the Sixth and Fourteenth Amendments to the United States Constitution. Because defendant has offered only one analysis under the statute and the state and federal constitutions, we assume, without deciding, that the analysis is the same under all three sources. *See State v. Langley*, 314 Or 247, 259, 839 P2d 692 (1992) (making the same assumption).

Following this questioning, defendant offered into evidence two documents. The first was a "Modified Probation Judgment and Order" related to the last conviction to which Randolph had testified. That document indicated that Randolph had been indicted on one count of first degree theft and two counts of ex-convict in possession of a firearm, that he had been convicted of the theft count and placed on probation, and that he was now in violation of that probation.[7] The second document was a Judgment of Conviction and Sentence, evidencing Randolph's conviction on another charge of first degree theft and containing the terms of probation on that conviction.

The state objected to the admission of the documents on the grounds that they were cumulative and that they contained more information than the crime and date of conviction. The trial court sustained the objection, and defendant assigns that ruling as error. We conclude that no error was committed.

Defendant argues that, under OEC 609, the trial court was required to admit the documents. OEC 609(1) provides:

"For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime *shall be admitted* if elicited from the witness or established by public record, but only if the crime (a) was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted, or (b) involved false statement or dishonesty."

(Emphasis supplied.) Defendant contends that the trial court had no discretion to exclude the documents under OEC 403 as "cumulative" evidence,[8] even though Randolph had already testified to at least one of the convictions during cross-examination. Relying on *State v. King*, 307 Or 332, 768 P2d 391 (1989), defendant argues that a trial court must admit *all*

---

[7] This document contradicts Randolph's own testimony that he was convicted of the ex-convict in possession of a firearm charge, in addition to the first degree theft charge.

[8] OEC 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or *needless presentation of cumulative evidence*." (Emphasis supplied.)

evidence that falls under OEC 609(1), "without regard for the 'balancing' provided for by OEC 403."

In *State v. King, supra,* 307 Or at 337, this court stated: "In the context of evidence presented pursuant to OEC 609, we hold that balancing is impermissible." However, the specific issue in *King* was "whether the trial court was required to 'balance' *the probative value of the evidence against its prejudicial effect." Id.* at 334 (emphasis supplied). Thus, *King* did not address the propriety of balancing the probative value of impeachment evidence against "considerations of * * * needless presentation of cumulative evidence."

A brief review of the history of OEC 609 reveals the error in defendant's argument. As originally enacted by the legislature in 1981, OEC 609 provided for impeachment by evidence of a prior conviction of a crime punishable by death or imprisonment in excess of one year "only if * * * the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the defendant." Or Laws 1981, ch 892, § 53.[9] Thus, OEC 609 provided its own test for balancing probative value against prejudicial effect, but that test applied only in criminal cases and only to the criminal defendant. *See* Legislative Commentary to OEC 609, reprinted in Kirkpatrick, Oregon Evidence 352-54 (2d ed 1989) (discussing OEC 609 balancing test).

In 1986, however, the people of Oregon, through the initiative process, approved Ballot Measure No. 10, the "Crime Victims' Bill of Rights." Or Laws 1987, ch 2, § 1. That ballot measure deleted the balancing test from OEC 609. *Id.* § 9. Section 2 of the measure stated an overall purpose for the measure that explains the change in OEC 609:

> "The purpose of this ballot measure is to declare to our legislature and our courts that victims' rights shall be protected at each stage of the criminal justice system. We reject the notion that a criminal defendant's rights must be superior to all others. By this measure we seek to secure balanced justice by eliminating unbalanced rules."

*Id.* § 2.

---

[9] This balancing test did not apply to crimes involving "false statement," no matter what the punishment. Or Laws 1981, ch 892, § 53.

The purpose of the 1986 amendment to OEC 609 that eliminated the special balancing test in favor of criminal defendants was to ensure that evidence of a defendant's prior convictions offered to impeach the defendant's testimony would not be excluded because of the prejudicial effect of that evidence. Nothing in the 1986 amendment, however, demonstrates that the people intended that *all* evidence of prior convictions be admitted for impeachment purposes, even when that evidence is merely cumulative of other evidence already admitted.

Even before the enactment of the Oregon Evidence Code, a trial court could, in its discretion, reject evidence that was cumulative. *See, e.g., Welch v. U.S. Bancorp*, 286 Or 673, 709, 596 P2d 947 (1979) (trial judge properly exercised discretion in excluding cumulative evidence). OEC 403, which expressly allows for the balancing of probative value against "needless presentation of cumulative evidence," codified that long-standing principle of Oregon evidence law. *See State v. Hubbard*, 297 Or 789, 796-97, 688 P2d 1311 (1984) (stating that OEC 403 "codifies existing law"). Nothing in the history of OEC 609 shows that evidence of prior convictions offered to impeach a witness should be exempt from OEC 403.

■■     We conclude, therefore, that a trial court, in exercise of its discretion under OEC 403, may exclude evidence offered under OEC 609 if the probative value of that evidence "is substantially outweighed by * * * considerations of * * * needless presentation of cumulative evidence." In this case, the trial court exercised its discretion to exclude documentary evidence of some of Randolph's prior convictions, because that evidence was cumulative of Randolph's own testimony regarding his criminal record. We find no abuse of discretion in that ruling.

*Juror Misconduct*

■     A week into the guilt phase of defendant's second trial, it came to the court's attention that one of the alternate jurors had made several comments about the case to other jurors and to court staff. The court questioned each of the jurors and the court staff individually. That questioning revealed that the alternate juror had made several comments wondering what had happened to Carrie Love's suitcase, a

question unresolved by the testimony in the case. Also, after viewing the autopsy photographs of the victim, the alternate juror had commented to the court bailiff, out of the hearing of the rest of the jury, that "nobody deserves that kind of treatment."

After the court had questioned all jurors and cautioned the alternate juror not to talk about the case any further, defendant moved for a mistrial. The trial court denied the motion, finding as follows:

> "Relating to the motion for mistrial that the Court has had under advisement over night, the Court finds that the remarks of the alternate juror in question did not introduce any extraneous information into the trial and the remarks that he did make were overheard by very few of the jurors and the principal one about what happened to her suitcase did not indicate any prejudice toward the defendant.

> "The most damaging of the statements, that is that no one deserved to be treated like this, referring to the autopsy photographs, were made to the bailiff and were not overheard by other jurors.

> "The statement was a premature comment about the possible provocation which is the issue in question three in the penalty phase and they should not have been made, but it did not introduce any prejudice toward the defendant to any of the jury because they did not hear it.

> "The irregular event which caused each of the jurors to be interviewed in chambers I don't believe caused prejudice against the defendant.

> "The motion for mistrial is denied."

Defendant assigns that ruling as error.

■    "A motion for mistrial is 'addressed to the sound discretion of the trial judge,' who is in the best position to assess and to rectify the potential prejudice to the defendant." *State v. Farrar*, 309 Or 132, 164, 786 P2d 161 (quoting *State v. Jones*, 242 Or 427, 433, 410 P2d 219 (1966), *cert den* 498 US 879 (1990). In determining whether a mistrial should have been declared, this court reviews for abuse of discretion. *State v. Smith*, 310 Or 1, 24, 791 P2d 836 (1990).

In this case, the trial court carefully assessed whether the comments by the alternate juror could have

caused any possible prejudice to defendant. The trial court concluded that no harm had been done. Defendant suggests no persuasive reason why the trial court should have concluded otherwise. The trial court did not abuse its discretion in denying the motion for mistrial.

*Motion for Judgment of Acquittal*

After the close of the state's evidence and again at the end of the guilt phase, defendant moved for a judgment of acquittal on count two, arguing that the state had failed to show that the murder occurred during the course of the maiming of the victim. The trial court denied the motion, and defendant assigns that ruling as error.

ORS 163.095(1)(e) sets out the elements of the charge: "[A]ggravated murder' means murder as defined in ORS 163.115 which is committed under, or accompanied by, any of the following circumstances: * * * (e) The homicide occurred in the course of or as a result of intentional maiming or torture of the victim." Defendant does not challenge the sufficiency of the evidence that the victim's body was maimed. Rather, he asserts that "the clear meaning of ORS 163.095(1)(e) is that the acts constituting maiming must have been performed while the victim was alive" and that there was insufficient evidence for the jury to find that Love was alive when she was maimed.

We need not decide that issue, however, because, even if defendant were correct, the insufficiency of the evidence as to count two did not affect his conviction on count one or the resulting sentence of death. *See State v. Langley, supra,* 314 Or at 269 (trial court's error in denying defendant's motion for acquittal held to be reversible error; however, remaining aggravated murder convictions affirmed). Indeed, defendant does not suggest any manner in which the submission of count two to the jury might have affected adversely his conviction or sentence on the charge of aggravated murder in the course of an attempted rape, and no such adverse effect is apparent to this court. Even if this court were to reverse defendant's conviction on count two, he still would stand convicted of one count of aggravated murder, and the sentence of death would remain. Accordingly, we decline to address the sufficiency issue further.

### Jury Instructions

■ Defendant assigns as error two rulings of the trial court related to jury instructions. First, defendant complains of the instruction that the court used to define "reasonable doubt." During voir dire, at the close of the guilt phase, and at the close of the penalty phase, the court read essentially the same instruction, as follows:

> "Reasonable doubt means an honest uncertainty as to the guilt of the defendant. It's based on reason and common sense. Proof beyond a reasonable doubt is such proof as you would be willing to act upon in the most important of your own affairs."[10]

Defendant excepted to that instruction, offering in its stead an instruction that would have replaced the second sentence above with the following sentence, drawn from Uniform Criminal Jury Instruction No. 1006: "Reasonable doubt exists when, after careful and impartial consideration of all the evidence in the case, you do not feel convinced to a moral certainty that the defendant is guilty."

Defendant argues that, without the additional sentence that he offered, the instruction given by the court "failed to define for the jury what 'reasonable doubt' means." That argument is wrong. The court's instruction expressly stated that "[r]easonable doubt *means an honest uncertainty as to the guilt of the defendant.*" The additional sentence employing the phrase "moral certainty" was not necessary to define the meaning of "reasonable doubt." *Cf. State v. Williams*, 313 Or 19, 37, 828 P2d 1006 ("We do not endorse or require the use of the phrase 'moral certainty' "), *cert den* ___ US ___, 113 S Ct 171 (1992).

Moreover, as this court stated in *State v. Williams, supra*:

> "Unless a reasonable doubt instruction misleads the jury to believe that it can convict on a lesser degree of proof than that required, the court will not find error. * * * For an instruction to constitute reversible error, it must have prejudiced the defendant when the instructions are considered as a whole."

---

[10] At the close of the penalty phase, the trial court substituted "as to the issue in question" in place of "as to the guilt of the defendant."

313 Or at 38. The reasonable doubt instruction employed in this case did not mislead the jury regarding the burden of proof and did not prejudice defendant. Thus, the trial court did not err in giving that instruction.[11]

Defendant also assigns as error the trial court's refusal to give his requested jury instruction on weaker and less satisfactory evidence. We have fully considered this claim and conclude that a full explication of it in these pages would add nothing to the body of law on the subject. On the facts of this case, the trial court did not err.

### Jury Deliberations

■ During deliberations following the guilt phase, the jury sent a note to the trial court asking why this was "the second trial." Defendant moved for a mistrial, arguing that the jury was considering "inside information that didn't come out during the trial" and that this information was "entering into their deliberations." The trial court denied the motion and instructed the jury as follows:

> "Members of the Jury, I have the note that one of you handed to the Bailiff in which you inquire about a second trial. It—it is not material to your decisions in this case for you to have the answer to that. Please make your decision based on the evidence that's come before you here in the courtroom and the Court's instructions."

Defendant assigns that ruling as error.

■ As previously noted, "[a] motion for mistrial is 'addressed to the sound discretion of the trial judge,' who is in the best position to assess and to rectify the potential prejudice to the defendant." *State v. Farrar, supra*, 309 Or at 164. This court's scope of review on whether a mistrial should have been declared is one of abuse of discretion. *State v. Smith, supra*, 310 Or at 24.

---

[11] Defendant also argues that the court's reasonable doubt instruction violated his right to due process under the Fourteenth Amendment to the United States Constitution. "The federal standard for reasonable doubt is substantially the same as our own." *State v. Williams*, 313 Or 19, 41, 828 P2d 1006, *cert den* ___ US ___, 113 S Ct 171 (1992). Thus, defendant's argument under federal law fails, as well.

As the state noted before the trial court, the jury's question did not necessarily mean that the jury was considering extraneous information. The jury could have deduced from various factors, including references to prior testimony, that this was defendant's second trial. Furthermore, the trial court acted swiftly to rectify any possible prejudice to defendant by instructing the jury to consider only the evidence produced during this trial and the court's instructions. Under the circumstances, the court did not abuse its discretion in denying a mistrial.

## PENALTY PHASE
## ASSIGNMENTS OF ERROR

### *Former Jeopardy*

■    Before trial, and again after the state had rested its penalty-phase case, defendant moved to exclude the death penalty from consideration based on alleged official misconduct during the original trial. The court denied that motion, and defendant assigns that ruling as error.

The facts of the alleged incident of official misconduct are as follows. At defendant's first trial in 1988, the lead police investigator in the case, Oregon State Police Detective Cooper, spoke to three jurors following the guilt phase while escorting them to their cars. The next day, Detective Cooper told the prosecutors about his contact with the jurors, and the prosecutors notified the trial court and defense counsel. Defendant moved for a mistrial or, in the alternative, for a directed life sentence.

At a hearing on defendant's motion, Detective Cooper and the three jurors testified. Detective Cooper testified that he had responded to a juror's question by stating that "[defendant] is probably the most dangerous person I have worked." Two of the three jurors indicated that they had heard this remark. The third juror testified that she had heard nothing that Detective Cooper said about defendant, but that he had told her, "[I]f you feel you made the right decision, then, you know[,] don't think you could have done otherwise."

After the hearing, the trial court denied defendant's motion. Nevertheless, the court dismissed the two jurors who

had heard Detective Cooper's remark about defendant, and the court placed the two alternate jurors on the jury for the penalty phase. The court, however, refused to dismiss the third juror.

On appeal from the first trial, defendant assigned as error the denial of his motion for mistrial. This court did not reach that assignment of error, because it reversed the case on other grounds. *State v. Pratt, supra*, 309 Or at 217. The issue then arose during this second proceeding.

After a hearing, the trial court denied the motion to remove the death penalty from the jury's consideration. After the state had rested its penalty-phase case, defendant renewed the motion, and the court denied it again:

> "The court personnel responding to the requests of some of the jurors to have an escort to the dimly lighted parking areas did not specifically ask Detective Cooper to be an escort.

> "Detective Cooper was an official of the prosecution. Detective Cooper in the course of conferring with the State's trial attorneys revealed the improper contact with two jurors. Detective Cooper did not report it as something that he recognized as improper. The brief inadvertent harmless contact between Detective Cooper and the third juror * * *, did not necessitate that juror's dismissal and is not the kind of prosecutorial misconduct that would justify dismissal of the penalty phase with prejudice."

Defendant contends that the trial court erred. According to defendant, Detective Cooper's conduct during the first trial was such that "the state and federal constitutional prohibitions against double jeopardy precluded submitting a possible death sentence to a second jury."

■    Article I, section 12, of the Oregon Constitution,[12] bars retrial "when improper official conduct is so prejudicial to the defendant that it cannot be cured by means short of a mistrial, *and* if the official knows that the conduct is improper and prejudicial *and* either intends or is indifferent to the resulting mistrial or reversal." *State v. Kennedy*, 295 Or 260, 276, 666 P2d 1316 (1983) (emphasis supplied). Under that

---

[12] Article I, section 12, of the Oregon Constitution provides: "No person shall be put in jeopardy twice for the same offence (sic), nor be compelled in any criminal prosecution to testify against himself."

standard, the state is held "only to the consequence of what its official knew to be prejudicial misconduct, not what he or she should have known." *Id.* at 277. Thus, even in those cases in which official misconduct warrants a mistrial, there must at least be a further finding that the official "knowingly acted in an improper and prejudicial manner, indifferent to the mistrial that could be expected to result, before reprosecution will be barred." *Id.*

In this case, the trial court did not make findings that indicate a violation of the *Kennedy* standard, nor do the trial court's rulings in either the first or the second trial allow us to infer that the court would have made such a finding if asked. In the first trial, the trial court did not grant a mistrial, instead concluding that any possible prejudice from Detective Cooper's conduct could be cured by replacing two of the jurors with the alternate jurors. During the second trial, in denying defendant's motion to exclude the death penalty from the jury's consideration, the trial court impliedly affirmed the ruling at the earlier trial. Moreover, the actual findings of the court during the second trial, which are set out above, imply a contrary finding — *i.e.*, that Detective Cooper did *not* "knowingly act[] in an improper and prejudicial manner, indifferent to the mistrial that could be expected to result." We reject defendant's argument that Article I, section 12, of the Oregon Constitution barred submission of the death penalty to the jury in the second trial.

■ We also reject defendant's argument under the Double Jeopardy Clause of the Federal Constitution. The Supreme Court of the United States has held that the federal Double Jeopardy Clause[13] bars reprosecution in cases like the present one only when "the conduct giving rise to the successful motion for a mistrial was *intended* to provoke the defendant into moving for a mistrial." *Oregon v. Kennedy*, 456 US 667, 678, 102 S Ct 2083, 72 L Ed 2d 416 (1982) (emphasis supplied). There is nothing in the record to show that Detective Cooper acted with indifference to provoking a mistrial, let

[13] The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution ("nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb") applies to the states through the Due Process Clause of the Fourteenth Amendment. *Benton v. Maryland*, 395 US 784, 89 S Ct 2056, 23 L Ed 2d 707 (1969).

alone with the intent to provoke one. Consequently, defendant's argument under the federal constitution fails along with his argument under the state constitution. Detective Cooper's conduct during the first trial was not a bar to consideration of the death penalty by the jury, and the trial court was correct in so ruling.

### Death Row Evidence

During the penalty phase, the state called as a witness Bart Lousignont, a former inmate who had been incarcerated with defendant for a time in the Klamath County Jail. On cross-examination, the following exchange occurred:

"Q. I think you said something in one of your statements that people looked up to [defendant] when he was brought in but later when they found out what he was charged with uh the rape part, he wasn't a big man anymore. Is that what you said?

"A. Uh, basically everybody kind of flicked him a little bit of crap for it, yeah.

"Q. Okay. Because they, because of the allegation of rape?

"A. Because of the—the allegation of rape, yes.

"Q. And isn't that, isn't that accurate of what you said, he wasn't a big man anymore?

"A. Uh, I don't know how to say it. It is like he is and he ain't, you know?

"Q. Pardon?

"A. I don't know how to explain it. It's like he—he's still a threat *because everybody knows that he's been on death row* and he didn't have a whole lot to lose but. I don't know. See I use to kind of kiss Pratt's ass too until I found out about it, about the—the rape charge on him. And see I—I—I—I can't even be locked up with him now. You know they won't even put the two of us together.

"Q. Okay, but my question is, in this statement you wrote out a part of a statement didn't you? You said later everyone learned that he raped that girl. At that point [defendant] was nothing more than a rape-o that killed someone. He wasn't a big man anymore. Isn't that what you wrote out?

"A. Yeah, they don't look up to him like he's a big murderer anymore."

(Emphasis supplied.)

Defendant's cross-examination of Lousignont then continued for what amounts to five pages of transcript. After re-direct and re-cross examination amounting to seven more pages of transcript, Lousignont was allowed to step down. Following a ten-minute recess, Lousignont underwent further brief examination outside the presence of the jury. After that further examination, defendant moved for a mistrial based on the witness's testimony that defendant had been on death row. The court took the motion under advisement, then ruled as follows:

"Well I've read the authorities that were cited by both parties. [The] Court found that the prosecution didn't participate in causing the remark to be made and the State did not capitalize on the disclosure in any way. There's no reason to believe that the defense provoked the disclosure in order to cause a mistrial.

"* * * * *

"The State caused their witnesses to be instructed not to divulge anything about the prior trial and the conviction, including the witness Bart Lousignont who made the disclosure. The State satisfied its duty to try to prevent the disclosure by doing so. The disclosure came as a result of cross examination.

"After considering the direct testimony of the witness Lousignont and the cross examination, [the] court's finding is that the defense depended on a witness with three felony convictions to not only understand but to follow the rules. And then questioned him about the very reason the defendant had been looked up to by the other inmates. This resulted in the unfortunate disclosure.

"The court finds that it was inadvertently invited similar to the occurrence in *State v[.] Hamilton*, [4 Or App 214, 476 P2d 207 (1970)]. Several times during the trial the jury has learned that this is a retrial for aggravated murder. It's inevitable that a jury on a retrial would not [sic] learn of this. There's a comment about that in *State v[.] Coe*, [750 P2d 208 (Wash 1983)]. The remark was isolated and made in passing and I don't believe the disclosure that the defendant had

been on death row was so damaging as to warrant a mistrial of the penalty phase.

"Therefore the motion for mistrial is denied and the alternative motion for a directed sentence of life imprisonment is denied."

Defendant assigns that ruling as error.

As we have noted already, this court reviews the trial court's ruling on a motion for mistrial for abuse of discretion, because the trial court is in the best position to assess and rectify any potential prejudice to defendant. In *State v. Farrar, supra*, 309 Or at 164, this court held that the trial court did not abuse its discretion in denying a mistrial where a state's witness had mentioned a polygraph examination, "because [the reference] was isolated and made only in passing, the results of the test were not disclosed, and the state never argued that the test had any significance to the witness's credibility or to any other issue in the case."

Although the inadvertent testimony in this case was of a different, possibly more prejudicial, nature than the testimony in *Farrar*, the considerations that guided the decision in *Farrar* are also present here. The trial court found specifically that the mention of defendant being on death row was "isolated and made in passing" and that the state "did not capitalize on the disclosure in any way." The trial judge, who was present throughout the entire trial and who heard the inadvertent testimony in its full context, concluded that the evidence was not so damaging as to warrant a mistrial. We find no abuse of discretion in that ruling.

## Other Assignments

Defendant makes several other assignments of error. We have considered all of them. We conclude that none is well taken and that discussing any at length would not aid bench or bar in future cases.

## CONCLUSION

The judgment of conviction and sentence of death are affirmed.

**FADELEY, J.,** dissenting.

The Oregon death penalty statute did not meet federal constitutional muster at the time that the homicide in this case occurred, according to the Supreme Court of the United States. That court vacated a death sentence imposed under that statute and remanded the case to this court in *Wagner v. Oregon*, 492 US 914, 109 S Ct 3235, 106 L Ed 2d 583 (1989).

After *Wagner v. Oregon, supra,* was decided, this court added 100 words to the 1984 statute in an effort to permit use of the deficient statute to impose death. *See State v. Moen*, 309 Or 45, 102-04, 786 P2d 111 (1990) (Fadeley, J., dissenting), and *State v. Wagner (II)*, 309 Or 5, 20, 786 P2d 93 (1990) (Linde, J., dissenting). This court had no authority to do that.[1] Only the legislative branch (which in the case of an initiated statute includes the voters) may enact penal laws. *See State v. Isom*, 313 Or 391, 395, 837 P2d 491 (1992) ("the power of punishment is legislative").

That being true, the statute is deficient as it applies to the death penalty in this case. Accordingly, life in prison is the penalty supported by the 1984 statute, as enacted, that survives the decision rationale in *Wagner v. Oregon, supra*. I dissent from the majority's approval of a sentence other than that authorized by the surviving portion of the Oregon statutory law applicable at the time of the murder in this case.

---

[1] ORS 174.010. *See, e.g., Rosentool v. Bonanza Oil and Mine Corp.*, 221 Or 520, 527, 352 P2d 138 (1960) (legislature would have placed the words "upon proof of a proper purpose" in the statute had it so intended, and this court is precluded from adding the words to the statute).