Argued and submitted September 5, 1995, judgment of conviction and sentence of death affirmed December 6, 1996

# STATE OF OREGON,
*Respondent,*

*v.*

# JERRY LEE MOORE,
## aka Harry Charles Moore,
*Appellant.*

## (CC 92C-20781; SC S40506)

927 P2d 1073

397-c

David E. Groom, Deputy Public Defender, Salem, argued the cause for appellant. With him on the briefs was Sally L. Avera, Public Defender.

Robert B. Rocklin, Assistant Attorney General, Salem, argued the cause for respondent. With him on the briefs were Theodore L. Kulongoski, Attorney General, Virginia L. Linder, Solicitor General, and Kristin N. Preston, Assistant Attorney General.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, Fadeley, Graber, and Durham, Justices.*

CARSON, C. J.

Fadeley, J., dissented and filed an opinion.

---

* Unis, J., retired June 30, 1996, and did not participate in this decision.

## CARSON, C. J.

This case comes before this court upon automatic and direct review of a sentence of death, following defendant's convictions for three counts of aggravated murder and two counts of murder, involving the deaths of two persons, and two additional felony convictions. Defendant seeks reversal of all seven convictions or, in the alternative, asks us to vacate his sentence of death and remand this case for resentencing. For the reasons stated below, we affirm defendant's convictions and the sentence of death.

## I. SUMMARY OF FACTS

Because the jury found defendant guilty of all the crimes charged, we view the evidence presented at trial in the light most favorable to the state. *See State v. Charboneau,* 323 Or 38, 40-41, 913 P2d 308 (1996) (stating principle).

Defendant was convicted of murdering his mother-in-law and his father-in-law. A brief description of the family relationships involved in this case is helpful in order to understand the underlying facts. Defendant was married to Cynthia Moore ("defendant's wife"), who also was defendant's half-niece. Barbara Cunningham and Thomas Lauri ("defendant's mother-in-law" and "defendant's father-in-law," respectively, or "defendant's in-laws"), the two murder victims, were the parents of defendant's wife; defendant's mother-in-law also was defendant's half-sister. Irene Moore ("defendant's mother") was the mother of defendant and of defendant's mother-in-law. Defendant and his wife had a daughter ("defendant's daughter"), who was about seven months old when defendant committed the crimes of which he was convicted.

In the spring of 1992, defendant and his wife, daughter, and father-in-law all lived in the same house in Salem. Defendant's mother-in-law lived with defendant's mother, elsewhere in Salem. During May 1992, the relationship between defendant and his in-laws had become strained, because defendant's in-laws had questioned the validity of defendant's marriage to their daughter. At around that same time, defendant's wife began to think about leaving defendant. She did not tell defendant about her plans.

Defendant began to suspect that his wife was planning to leave him and that she would take their daughter with her. On Memorial Day weekend, defendant threatened his wife with a gun and said that he would kill her or anyone else who tried to take their daughter away from him. Several days later, defendant's wife called the police, who arrested defendant. After being released from jail, defendant removed some personal items, including the gun later used to shoot his in-laws, from the house that he shared with his wife, daughter, and father-in-law, and moved into his mother's house. Defendant's mother-in-law then moved out of that house and into the house shared by defendant's wife, daughter, and father-in-law.

On June 5, 1992, defendant drove to the main post office in Salem, knowing that his father-in-law had gone there to check his mailbox. Defendant waited for his father-in-law to come out of the post office and watched him get into his truck in the parking lot. Defendant then walked over to the truck and shot and killed his father-in-law. Defendant next went to the house that his wife and daughter were sharing with his in-laws. Defendant kicked in the front door and shot his mother-in-law several times, killing her in front of his wife. Defendant then took his wife and daughter outside the house, forced them into his vehicle, and left Salem.

Defendant drove back to Salem later that night with his wife and daughter. He went to his mother's house, which was being searched by police, and was arrested at that time. Defendant later told the investigating detective that he had killed his in-laws in order to stop their interference with his relationships with his wife and daughter.

The state charged defendant with two counts of aggravated murder, ORS 163.095(1)(d) (counts one and two of the indictment); one count of aggravated murder, ORS 163.095(2)(d) (count three)[1]; two counts of murder, ORS

---

[1] ORS 163.095 (1991) provided, in part:

"As used in ORS 163.105 and this section, 'aggravated murder' means murder as defined in ORS 163.115 which is committed under, or accompanied by, any of the following circumstances:

"(1)(a) * * *

163.115(1)(a) (counts four and five)[2]; one count of burglary in the first degree (count six)[3]; and one count of kidnapping in the second degree (count seven).[4] A jury convicted defendant of all seven counts. Following the guilt phase of defendant's trial, the trial court merged the aggravated murder counts with the murder and burglary counts. After the jury answered the four statutory penalty-phase questions in the affirmative, ORS 163.150(1)(b), the court sentenced defendant to death. ORS 163.150(1)(f).

Defendant raises 12 assignments of error upon direct review, six relating to the guilt phase of his trial and

---

"* * * * *

"(d) There was more than one murder victim in the same criminal episode as defined in ORS 131.505."

In addition, ORS 163.095(2) (1991) provided, in part:

"(d) Notwithstanding ORS 163.115(1)(b), the defendant personally and intentionally committed the homicide under the circumstances set forth in ORS 163.115(1)(b)."

ORS 163.115(1) (1991) provided, in part:

"[C]riminal homicide constitutes murder:

"* * * * *

"(b) When it is committed by a person * * * who commits * * * any of the following crimes and in the course of and in furtherance of the crime the person is committing * * * the person * * * causes the death of a person other than one of the participants:

"* * * * *

"(C) Burglary in the first degree as defined in ORS 164.225[.]"

[2] ORS 163.115(1) (1991) provided, in part:

"[C]riminal homicide constitutes murder:

"(a) When it is committed intentionally * * * [.]"

[3] ORS 164.225(1) (1991) provided, in part:

"A person commits the crime of burglary in the first degree if the person violates ORS 164.215 and the building is a dwelling[.]"

ORS 164.215(1) (1991) provided:

"A person commits the crime of burglary in the second degree if the person enters or remains unlawfully in a building with intent to commit a crime therein."

[4] ORS 163.225(1) (1991) provided, in part:

"A person commits the crime of kidnapping in the second degree if, with intent to interfere substantially with another's personal liberty, and without consent or legal authority, the person:

"(a) Takes the person from one place to another[.]"

six relating to the penalty phase. We discuss each assignment of error below.

## II. GUILT PHASE

### A. *Suppression of Defendant's Statements*

Defendant first assigns error to the trial court's denial of parts of defendant's pretrial omnibus motion, in which defendant moved to suppress all statements that he had made, after his arrest, to two police detectives and to a state-hired psychologist. Defendant makes three arguments, which we address in turn. We conclude that none of those arguments is well taken.

The relevant chronology is as follows. Defendant was arrested immediately upon returning to his mother's house shortly before midnight on June 5, 1992. After one detective, Peterson, told defendant that he was under arrest, defendant said, "I know, but you may want this first," and handed his gun to Peterson. After Peterson handcuffed defendant, another detective, Stoelk, moved defendant into a bedroom. Stoelk then read defendant *Miranda* warnings, and defendant orally acknowledged those warnings and agreed to speak with Stoelk. Following a brief interview, Stoelk drove defendant to the police station. Shortly after midnight on June 6, 1992, Stoelk again read defendant *Miranda* warnings. Defendant orally consented to another interview and signed an acknowledgment of advice-of-rights card.

Following that interview, Dr. Cochran, a psychologist hired by the state, examined defendant at the police station, between about 1:00 a.m. and 6:00 a.m. on June 6, 1992. At the outset of that examination, Cochran also read defendant *Miranda* warnings and further advised defendant that he, Cochran, was a representative of the state and that no physician-patient privilege attached to the examination. Defendant acknowledged his rights and signed an acknowledgment of advice-of-rights form, which included a statement that no privilege attached. During both interviews with Stoelk and also during Cochran's examination, defendant confessed that he had murdered his in-laws and made other incriminating statements. Defendant also had made some

unsolicited incriminating statements to Stoelk during the drive to the police station.

■ Defendant first challenges the admission of all the statements mentioned above, because he had not spoken to a lawyer before making them. Defendant concedes that, before his interviews with Stoelk and his examination by Cochran, he had received and acknowledged *Miranda* warnings. He asserts, however, that, "[i]n this situation, a defendant who is suspected of a crime of this nature should be given the absolute right to talk to an attorney prior to the time any questioning takes place."

No authority exists for that contention, and it does not merit extensive discussion here. It is clear from the record that both Stoelk and Cochran complied with the requirements of *Miranda v. Arizona*, 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694 (1966). We reject defendant's contention that, because he was under investigation for a double homicide, the state should not have questioned him under any circumstances until he had spoken with a lawyer.

■■ Defendant next argues that his statements were not voluntary. When reviewing the voluntariness of a defendant's statements to police or other representatives of the state, "we will not disturb the trial court's findings of historical fact if evidence supports them." *State v. Stevens*, 311 Or 119, 135, 806 P2d 92 (1991) (*Stevens I*), *on remand* 319 Or 573, 879 P2d 162 (1994). In this case, the trial court made these findings when it denied defendant's motion to suppress:

"* * * Dr. Cochran administered appropriate Miranda rights to the defendant prior to the interview. Dr. Cochran also advised the defendant that he was present at the request of the Marion County District Attorney and that there would be no confidentiality about the subject matter of the interview, and that the results could be used against him in court. The defendant freely, knowingly, and voluntarily waived those rights before speaking with Dr. Cochran. * * *

"* * * The defendant volunteered the initial statement about the gun to Detective Peterson. Thereafter the police administered 2 different sets of Miranda warnings to the

defendant prior to questioning the defendant. The police made no threats or promises to the defendant during the questioning. The defendant freely, knowingly, and voluntarily waived those rights and agreed to speak with the police."

After reviewing the record, we conclude that the evidence supports the trial court's findings. Those findings, in turn, support the trial court's conclusion that defendant's statements were made voluntarily. We reject defendant's argument to the contrary.

■ Finally, defendant argues that his statements to Cochran were subject to the physician-patient privilege. Because we agree with the trial court's findings, quoted above, we also reject that argument.

In summary, we conclude that defendant's arguments concerning the suppression of his post-arrest statements are not persuasive. The trial court did not err in denying defendant's motion to suppress those statements.

B. *Examinations by the State's Mental Health Experts*

Defendant next contends that the trial court erred in overruling his objection to the state's use of two mental health experts to rebut the affirmative defense of extreme emotional disturbance (EED). The relevant chronology is as follows. As mentioned earlier, Cochran, a psychologist, examined defendant shortly after his arrest, at the request of the district attorney's office. At the outset of that examination, defendant signed a consent form that stated that he was willing to be examined. Several months after his arrest, defendant filed a notice of intent to rely upon the affirmative defenses of EED and insanity due to mental disease or defect. Thereafter, over defendant's objection, Dr. Suckow, a state-hired psychiatrist, examined defendant pursuant to ORS 161.315 and 163.135(5).[5] Defendant then withdrew his notice of intent to rely upon the defense of insanity; however, he continued to assert the defense of EED. At trial, over defendant's objection, both Cochran and Suckow testified that

---

[5] The respective text of both statutes is quoted below.

defendant was not acting under the influence of EED when he committed his crimes.

Defendant's assignment of error concerns the applicability of two statutes, ORS 161.315 and 163.135(5).[6] ORS 161.315, which relates to the affirmative defense of insanity due to mental disease or defect, provides, in part:

> "*Upon filing of notice* * * * by the defendant [of intent to introduce evidence of insanity due to mental disease or defect] as provided in ORS 161.309(3), *the state shall have the right* to have *at least one psychiatrist or licensed psychologist* of its selection examine the defendant. The state shall file notice with the court of its intention to have the defendant examined." (Emphasis added.)

ORS 163.135(5), which relates to the affirmative defense of EED, provides, in part:

> "*After the defendant files notice* [of intent to introduce evidence of EED] as provided in this section, *the state shall have the right* to have *at least one psychiatrist* of its selection examine the defendant in the same manner and subject to the same provisions as provided in ORS 161.315." (Emphasis added.)

Defendant contends that, under those statutes, the trial court erred in allowing both the examinations and the testimony by *two* state-hired mental health experts. Defendant first argues that the trial court erred in allowing Suckow's examination, because Cochran already had examined him. He also argues that "[t]here must be some showing, by implication, that more than one expert is necessary, and the state must make this showing before the testimony of the second mental health expert can be admitted. In this case, no such showing was made." We conclude that defendant's contention is not well taken.[7]

---

[6] We quote the 1995 version of both statutes, neither of which has been amended since defendant committed his crimes in 1992. With the exception of the type of mental health expert selected, the relevant parts of both statutes are the same.

[7] We note that both ORS 161.315 and 163.135(5) discuss the *examination* of a defendant, as opposed to the *testimony* of the mental health expert relating to that examination. Neither party explicitly raises the issue whether the statutes relate to the *testimony* of Cochran and Suckow, although defendant essentially makes that argument in contending that Suckow's testimony was improper. We need not

■ When construing a statute, this court's task is to discern the intent of the legislature. ORS 174.020; *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993). In our first level of analysis, we examine the text and context of the statutes at issue. *PGE*, 317 Or at 610-11.

We begin with the text of the statutes, which provides the best evidence of the legislature's intent. *See id.* at 610 (stating principle). Defendant focuses upon the wording that "the state shall have the right to have *at least one* [mental health expert] * * * examine the defendant" (emphasis added) and argues that that wording suggests that the state may conduct *one* examination of a defendant, such as Cochran's examination, but that any *additional* examinations, such as Suckow's, require a demonstration that more than one examination is necessary.

■ We disagree that the text of ORS 161.315 and 163.135(5) supports defendant's reading of those statutes. To the contrary, the wording "at least one" clearly grants the state the opportunity to examine a defendant more than once, after that defendant has filed a notice of intent to rely upon either insanity or EED. Moreover, the statutes do not speak to any examinations conducted *before* a defendant files such a notice, suggesting that an examination such as Cochran's does not fall under either statute.

The wording "the state shall have the *right* to * * * examine the defendant" (emphasis added) also is instructive, because that wording suggests that the state has an unequivocal opportunity to examine a defendant who has filed a notice of intent to rely upon either insanity or EED, *regardless of that defendant's willingness to cooperate*. Stated another way, *despite a defendant's objection to being examined*, ORS 161.315 and 163.135(5) allow the state to conduct at least one examination *if* the defendant has filed such a notice.

■ We conclude that the text of ORS 161.315 and 163.135(5), that "the state shall have the right" to conduct "at least one" examination of a defendant who has filed a notice

---

address that issue in any event, because we conclude that only Suckow's examination was governed by the statutes.

of intent to rely upon either insanity or EED, concerns only *nonconsensual* examinations conducted *after* the defendant files such a notice. In other words, the statutes do not preclude consensual examinations conducted before a defendant files a notice of intent to rely upon certain affirmative defenses but, rather, serve simply to provide the state with an unequivocal right to examine a defendant who has filed such a notice. Nothing in the context of either statute compels a different conclusion.

■ In this case, Cochran conducted a consensual examination of defendant before defendant filed his notice of intent to rely upon insanity and EED. Consequently, Cochran's examination was not within the purview of either ORS 161.315 or 163.135(5). Rather, only Suckow's examination is subject to the statutory requirements. Because, under both statutes, the state "shall have the right to have at least one psychiatrist" examine the defendant after a notice is filed, Suckow's examination and testimony were proper.

## C. *The Admissibility of the State's Exhibits*

Defendant next assigns error to the trial court's overruling of his objection to certain exhibits offered by the state during its redirect examination of defendant's wife. The sequence of events at trial was as follows. On cross-examination, defendant's wife testified that: (1) defendant had created a false marriage certificate so that his wife and daughter could receive welfare benefits that would not affect his governmental assistance; (2) during the week before the murders, she did not let defendant visit their daughter; and (3) she had not planned to allow defendant to visit their daughter after she left defendant. During its redirect examination of defendant's wife, the state attempted to introduce certain exhibits, specifically, several forgery-connected items.[8] In response to defendant's objection to those exhibits, the state contended that they were necessary to show that defendant's wife was afraid to allow defendant visitation,

---

[8] The state's exhibits consisted of a briefcase that contained the following items belonging to defendant: social security cards; police identification cards; Army and armed forces identification cards and honorable discharge paperwork; and marriage and birth certificates.

because he easily could have changed his identity and disappeared with their daughter. The trial court allowed the state to introduce the exhibits, and defendant's wife then testified about her fears that defendant might have changed his identity and taken their daughter away.

At trial, defendant objected to the introduction of the state's exhibits, arguing that they "would be prejudicial to the Defendant at this stage of the game."[9] However, in this court, defendant now argues that the exhibits were inadmissible because: (1) under OEC 401, they were irrelevant to the issue of defendant's guilt; (2) under OEC 404(3), they constituted inadmissible evidence of defendant's "prior bad acts"; and (3) under OEC 403, they were unfairly prejudicial and, therefore, prevented defendant from receiving a fair trial under principles of due process.

■ We do not address the applicability of OEC 401 or 404(3) to the state's exhibits, because defendant did not argue at trial that either rule precluded their admission. *See State v. Isom*, 313 Or 391, 406, 837 P2d 491 (1992) (*Isom II*) (stating that "[a]n objection on one ground is not sufficient to preserve some other objection"). For the same reason, we also do not address defendant's due process argument. Consequently, we address only the issue whether, under OEC 403, the exhibits were unfairly prejudicial to defendant. We review the trial court's decision for an abuse of discretion. *See State v. Williams*, 313 Or 19, 29-30, 828 P2d 1006, *cert den* 506 US 858 (1992) (*Williams I*), *on remand* 322 Or 620, 912 P2d 364 (1996) (stating principle).

■ OEC 403 provides, in part, that, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." The relevant inquiry is not whether evidence introduced over one party's objection was prejudicial to that party, but whether that evidence was *unfairly* prejudicial. *State v. Lyons*, 324 Or 256, 280, 924 P2d 802 (1996). In the context of OEC 403, "unfair prejudice" means "an undue tendency to suggest decisions on an improper basis, commonly although not always

[9] Defendant also argued at trial that the exhibits exceeded the scope of defendant's cross-examination of his wife. Defendant does not raise that argument before this court, and, accordingly, we do not address it.

an emotional one." Legislative Commentary, cited in Laird C. Kirkpatrick, *Oregon Evidence*, 125 (2d ed 1989).

■ We conclude that the state's exhibits were not unfairly prejudicial to defendant. Defendant was charged with two violent murders, in addition to burglary and kidnapping. In our view, there was very little danger that the evidence suggesting that defendant may have forged certain documents would have influenced the jury improperly in its determination of defendant's guilt or innocence. *See State v. Nefstad*, 309 Or 523, 555-56, 789 P2d 1326 (1990) (finding no abuse of discretion under OEC 403 when the chance that certain evidence improperly influenced the jury was "infinitessimally slight"). Moreover, before the state introduced the exhibits, defendant's wife already had testified on cross-examination, without objection, that defendant had forged a marriage certificate. In view of those considerations, we hold that the trial court did not abuse its discretion in admitting the state's exhibits.

D. *Cumulative Evidence*

Defendant also assigns error to the trial court's overruling of his objection to certain testimony during the state's direct examination of Stoelk. Specifically, defendant objects to the following testimony:

"Q [by the prosecutor] During your interviews with the Defendant * * * at times did he become emotional or cry?

"A [by Stoelk] Somewhat, yes.

"Q How fast would the crying start and stop?

"* * * * *

"A *It was pretty much off and on, off and on*. When *he would begin to get emotional*, it was like a description about the times—about relationships with family. Then it would immediately stop and that was it.

"Q And be all right again or calm?

"A Right, no need for Kleen[e]x or time to recoup or anything." (Emphasis added.)

Defendant argues that the emphasized testimony was inadmissible, because it was cumulative of a tape-recorded interview between Stoelk and defendant, which the state had played for the jury just before Stoelk testified. We disagree.[10]

█ OEC 403 provides, in part, that, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by * * * considerations of * * * needless presentation of cumulative evidence." In this context, that rule requires a two-step inquiry: Whether the evidence at issue *is* cumulative and, if so, whether its probative value is substantially outweighed by considerations of its cumulative nature.

█ We conclude that Stoelk's testimony was not cumulative of evidence already before the jury and, consequently, that further inquiry under OEC 403 is unnecessary. As discussed earlier in this opinion, Stoelk conducted *two* interviews with defendant. The first took place shortly before midnight on June 5, 1992, at the home of defendant's mother immediately following defendant's arrest. The second took place just after midnight on June 6, 1992, at the police station. Defendant also made several comments to Stoelk while being transported to the police station. Only the interview at the police station was recorded, and it was that recording that the state played for the jury.

As noted above, the prosecutor asked Stoelk if, during his *interviews* with defendant, defendant became emotional or cried at any time. That question related to *all* Stoelk's conversations with defendant, not only to the tape recorded interview. Moreover, Stoelk's testimony *added* to the substance of the tape-recorded interview, because it gave the jury a description of defendant's demeanor during the interviews, which the jury may not necessarily have ascertained from listening to the recording. Consequently, Stoelk's testimony was not cumulative of the tape-recorded interview, and the trial court did not abuse its discretion in allowing that testimony.

---

[10] Defendant also contends upon review that Stoelk's testimony violated OEC 701, which concerns the admissibility of lay opinion testimony. However, defendant's argument was not preserved and, consequently, we do not address it.

## E. *Motion For Continuance*

Defendant next contends that the trial court erred in denying his *pro se* motion for a 30-day continuance, which defendant made near the end of his case-in-chief.[11] The colloquy between defendant and the court was as follows:

"[DEFENDANT]: Your Honor, I can tell right up front this Court is going the same way the charges did I filed against my sister [defendant's mother-in-law]. Nowhere. And I have got 20 witnesses to be called, two of them are in Michigan. And I don't have enough time to get them out here before this side of the case is relaxed and they go to it, they find you either guilty or not guilty. * * * I need more time. I want a 30-day extension on this.

"THE COURT: I can't afford to do that. This time has been scheduled for this block of time for not weeks but months, and it just can't be done.

"[DEFENDANT]: These people are very important to me. In fact, one kid I'm bringing out here is one that my sister did hire to kill me in spite of what he testifies.

"THE COURT: Motion is denied."

Granting or denying a motion for continuance is within the trial court's discretion, and this court will disturb such a ruling only if the trial court abused its discretion. *State v. Parker*, 317 Or 225, 231, 855 P2d 636 (1993). When a party requests a continuance because a witness is unable or fails to appear at trial, that party must demonstrate that: (1) the witness can be produced; and (2) if produced, the witness would testify about a material fact. *State v. Otten*, 234 Or 219, 223, 380 P2d 812 (1963). Even if those two requirements are met, however, the trial court still may deny a request for a continuance. *See Parker*, 317 Or at 231-32 (finding no abuse of discretion when the trial court denied the defendant's motion for a continuance, despite the defendant's demonstration that an expert witness merely was unable to

---

[11] Defendant's counsel was present when defendant made his *pro se* motion. From the record, it appears that defendant and his counsel disagreed with respect to which witnesses defendant should call in his case-in-chief and, consequently, defendant addressed the court on his motion.

appear on the scheduled trial date and that the witness would testify about material facts).

■ For the following reasons, we conclude that the trial court did not abuse its discretion in denying defendant's motion for a continuance. First, defendant stated neither that he had sought production of any of the witnesses, nor that the court could require those witnesses to attend the trial. Consequently, defendant failed to meet *Otten's* first requirement. Second, as to *Otten's* other requirement, defendant claimed only that the 20 witnesses were "very important" and that one witness was involved in an earlier plot by defendant's mother-in-law to have defendant murdered. Defendant did not demonstrate whether 19 of the witnesses would testify about any material facts. Moreover, as to the witness who defendant asserted was hired to kill him, defendant did not demonstrate that that witness would *testify* about a material fact. Rather, defendant stated his *own* belief about a murder plot, "in spite of what [the witness] testifies." In short, defendant did not meet either of the requirements set forth in *Otten*. Consequently, holding defendant to the same standard as we would defense counsel, we hold that the trial court did not abuse its discretion in denying defendant's motion.

## F. *Requested Jury Instructions Relating to Lesser-Included Offense*

■ Defendant also assigns error to the trial court's denial of his requested jury instructions that explained that the affirmative defense of EED, if proved by a preponderance of the evidence, would have a mitigating effect upon the charges of aggravated murder alleged in the indictment. Defendant contends upon review that the trial court should have submitted his requested instructions with respect to the two charges of aggravated murder under ORS 163.095(1)(d) (murdering more than one victim in the same criminal episode).[12] He essentially argues that EED, as set forth in ORS 163.135(1), provides an affirmative defense to the crimes of

_____

[12] The trial court did give an instruction describing the mitigating effect of EED upon the two charges of intentional murder under ORS 163.115(1)(a).

both murder *and* aggravated murder and that the jury should have been so instructed. We disagree.

ORS 163.135(1) provides, in part:

> "It is an affirmative defense *to murder for purposes of ORS 163.115(1)(a)* [intentional murder] that the homicide was committed under the influence of extreme emotional disturbance when such disturbance is not the result of the person's own intentional, knowing, reckless or criminally negligent act, and for which disturbance there is a reasonable explanation. * * * *Extreme emotional disturbance does not constitute a defense to a prosecution for, or preclude a conviction of*, manslaughter in the first degree or *any other crime.*" (Emphasis added.)

The meaning of ORS 163.135(1) is clear from its text and context. According to its text, EED is an affirmative defense *only* to the crime of murder, *as that crime is defined by ORS 163.115(1)(a)*, that is, criminal homicide committed intentionally. EED does not apply to felony murder, defined by ORS 163.115(1)(b), or murder by abuse, defined by ORS 163.115(1)(c). Likewise, under the wording of ORS 163.135(1), it also does not apply to "any other crime." Consequently, EED is not an affirmative defense to aggravated murder under ORS 163.095(1)(d).

Prior case law interpreting ORS 163.135(1) supports our conclusion. For the purpose of that statute, this court previously has held that aggravated felony murder, defined by ORS 163.095(2)(d), is a *different crime* from intentional murder, defined by ORS 163.115(1)(a). *State v. Wille*, 317 Or 487, 492, 858 P2d 128 (1993). Defendant argues that *Wille* is distinguishable, because that case involved aggravated *felony* murder, while this case concerns aggravated murder involving more than one victim as part of the same criminal episode. Defendant theorizes that, had he killed two victims not as part of the same criminal episode, the state would have charged him with two counts of intentional murder under ORS 163.115(1)(a) and, consequently, that the affirmative defense of EED would have been available to him. It follows, defendant argues, that he should not be precluded from asserting EED simply because the victims' deaths occurred during the same criminal episode.

 We reject that argument. Aggravated murder, whatever its form, is a different crime from intentional murder, as defined by ORS 163.115(1)(a). Accordingly, under the clear text of ORS 163.135(1), EED is not an affirmative defense to aggravated murder.

A related statute further supports our conclusion. ORS 163.115(1) provides, in part:

"[C]riminal homicide constitutes murder:

"(a) When it is committed intentionally, *except that it is an affirmative defense that, at the time of the homicide, the defendant was under the influence of an extreme emotional disturbance*[.]" (Emphasis added.)

ORS 163.115(1)(a) clearly states that EED may serve as an affirmative defense to the crime of intentional murder. The aggravated murder statute, ORS 163.095, contains no such description of EED. In short, the legislature clearly has stated that it intended EED to serve as an affirmative defense *only* to the crime of intentional murder, as defined by ORS 163.115(1)(a). Defendant's arguments to the contrary are not persuasive.

Having rejected all defendant's assignments of error relating to the guilt phase of his trial, we affirm all seven of defendant's convictions. We now turn to defendant's assignments of error relating to the penalty phase of his trial.

## III. PENALTY PHASE

A. *Admissibility of Evidence Under ORS 163.150(1)(b)*

Defendant first assigns error to the trial court's denial of his motion to limit the state's penalty-phase evidence only to evidence that directly was relevant to the first three statutory questions set forth in ORS 163.150(1)(b). He argues that some of the state's penalty-phase evidence was not relevant to the first three questions and, consequently, should not have been admitted. Defendant asserts that the admission of that evidence violated ORS 163.150(1) and his

right to due process under the Fifth and Fourteenth Amendments to the United States Constitution. We consider defendant's statutory argument before considering his constitutional argument. *See State v. Guzek*, 322 Or 245, 250, 906 P2d 272 (1995) (*Guzek II*) (so stating).

At the time of defendant's crimes in June of 1992, and of his trial in 1993, ORS 163.150(1)(b) provided:

"Upon the conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:

"(A) Whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that death of the deceased or another would result;

"(B) Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society;

"(C) If raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased; and

"(D) Whether the defendant should receive a death sentence."

In defendant's view, the fourth question permits only the admission of mitigating evidence and, consequently, the trial court erred when it admitted certain aggravating evidence that was not relevant to the first three questions. The state contends that the fourth question permits the introduction of aggravating evidence and, alternatively, contends that, even if only mitigating evidence is admissible under the fourth question, the evidence at issue was admissible under the second question. Because we agree with the state that the evidence was relevant under the second question, we do not address defendant's contention concerning the fourth question.[13]

---

[13] In *State v. Guzek*, 322 Or 245, 263, 906 P2d 272 (1995) (*Guzek II*), this court held that the *1989* version of ORS 163.150(1)(b)(D) allowed the introduction of only mitigating evidence. That holding is not controlling in this case, however, because defendant was prosecuted under the *1991* version of ORS 163.150(1)(b)(D), which contained a significantly different fourth question than the 1989 version of that statute.

█ As noted, ORS 163.150(1)(b)(B) requires that a jury in a death-penalty case determine "[w]hether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." That question, commonly referred to as the "future dangerousness" question, makes relevant any evidence that is probative of whether a defendant is likely to engage in dangerous, criminal conduct in the future. *See State v. Moen*, 309 Or 45, 76, 786 P2d 111 (1990) (applying principle).

Defendant challenges the admission of two types of evidence that the state now contends was relevant to the jury's determination of future dangerousness. Some of that evidence concerned defendant's attraction to teenage girls, and the remaining evidence concerned his belief in white supremacy. We address the relevance of each type of evidence in turn.

█ The evidence concerning defendant's attraction to teenage girls had two parts. First, the state introduced evidence that, before his marriage to his then-current wife, defendant had been sexually involved with two teenage girls, one of whom became pregnant. The record discloses that defendant's relationships with both girls involved a significant amount of violent conduct on defendant's part. Such violent conduct is relevant to the jury's determination whether defendant would be dangerous in the future and, consequently, is admissible under the second question. *See Williams I*, 313 Or at 43 (stating that "[e]vidence that goes to the question of [a] defendant's future probable violent behavior is relevant [to] * * * the issue of future dangerousness").

█ Second, the state elicited testimony from defendant's former neighbor concerning defendant's desire to have sexual relations with teenage girls. Defendant's neighbor testified that, on two occasions, defendant had made comments to him of a graphically sexual nature in reference to two young teenage girls. Defendant argues that the neighbor's testimony was not relevant, because "the incidents * * * were [not] accompanied by any act of violence, or by any action whatsoever. The comments were indicative of what was going on in defendant's brain at the time. The comments were ugly and distasteful, but they were not violent."

We disagree with defendant's assessment of the relevance of the neighbor's testimony. In *Williams I*, this court concluded that a defendant's statements that "he would like to rape a 'girl,' that it was something that he had thought about, and that he thought that it would be thrilling to do it," were relevant to the second question. 313 Or at 43. The court reasoned that the defendant's statements "indicated that [the defendant] may act violently toward women in the future." *Ibid.* We reach the same conclusion here. Defendant's comments demonstrated his desire to have forcible sexual intercourse with young teenage girls. That evidence, particularly when considered together with the evidence of defendant's actual, violent sexual relationships with two other teenage girls, was relevant to the jury's determination under the second question. Consequently, the trial court did not err in admitting that evidence.

■ We next consider defendant's contention that the state's evidence generally concerning defendant's belief in white supremacy was irrelevant to the issue of future dangerousness. At the outset, we again emphasize that the second question asks the jury to determine the likelihood of whether a defendant will engage in dangerous, criminal conduct "that will constitute a continuing threat to society." *Moen*, 309 Or at 73. Although that determination often focuses upon whether a defendant will commit *violent* criminal acts, this court has stated a number of times that ORS 163.150(1)(b)(B) permits the admission of a broad range of evidence. *See State v. Smith*, 310 Or 1, 29, 791 P2d 836 (1990) ("We consistently have held that ORS 163.150(1) * * * is to be interpreted broadly."). Such evidence may include a defendant's "*entire* previous criminal history," including nonviolent crimes, *Moen*, 309 Or at 73, 74-76 (emphasis added), unadjudicated bad acts committed by a defendant, *State v. Williams*, 322 Or 620, 632, 912 P2d 364 (1996) (*Williams II*), and, generally, "evidence of [a] defendant's previous bad character," *State v. Wagner*, 305 Or 115, 178, 752 P2d 1136 (1988), *vacated and remanded on other grounds* 492 US 914, 109 S Ct 3235, 106 L Ed 2d 583 (1989) (*Wagner I*), *on remand* 309 Or 5, 786 P2d 93, *cert den* 498 US 879 (1990). In sum, in making a determination under ORS 163.150(1)(b)(B),

"the jury should have before it all possible relevant information about the individual defendant whose fate it must determine. The relevant question during the sentencing hearing is whether the defendant will be dangerous in the future. ORS 163.150(1)(b)(B). Evidence of all of a defendant's prior conduct, bad and good, is precisely the type of evidence that the jury needs to make this determination." *Moen*, 309 Or at 73.

There is a limit, however, upon the broad range of evidence that is admissible under ORS 163.150(1)(b)(B). Because the standard of relevance set forth in OEC 401 applies in penalty-phase proceedings, *Guzek II*, 322 Or at 250, in order to be admissible, evidence offered under ORS 163.150(1)(b)(B) must have "[a] tendency to make the existence of any fact that is of consequence to the determination of the [question] more probable or less probable than it would be without the evidence," OEC 401. To be admissible under the second question, therefore, the proferred evidence must have a tendency to show that a probability either does or does not exist that the defendant will commit criminal acts of violence that would constitute a continuing threat to society.

During the penalty phase of defendant's trial, the state introduced extensive evidence that generally concerned defendant's belief in white supremacy. That evidence, the admissibility of which defendant challenges upon review, included: (1) testimony that neo-Nazi propaganda was found in defendant's home; (2) evidence that, on several different occasions, defendant had disseminated neo-Nazi and anti-Semitic literature and propaganda to members of his family and to the public; (3) the introduction of a photograph that showed defendant giving a "[S]ieg heil," or "Heil Hitler," salute; (4) testimony that defendant did not like people of African descent, Hispanics, or Jews; (5) testimony that defendant commonly referred to people of African descent as "niggers" and also had referred to an African-American corrections officer as a "Kaffir," which is a disparaging term sometimes used toward black South African citizens; (6) testimony that defendant believed that "[o]ur world should be all white" and that people of African descent, Hispanics, and

Jews "were supposed to die"; and (7) testimony about additional statements that demonstrated defendant's violent hatred toward minority groups, including testimony that defendant believed in "killing black people."

■ Defendant asserts that the evidence described in the preceding paragraph merely was indicative of his beliefs and was not probative of his future dangerousness. We agree with defendant that, standing alone, evidence that a defendant believes that one race is superior to all others, or that a defendant uses disparaging language to refer to people of other races, generally is irrelevant under the second question. A mere expression of one's beliefs, such as those made here, does not, in and of itself, indicate that the holder of those beliefs will be dangerous in the future. Words of such an abstract and general nature, in the absence of any related conduct, cannot serve as an indicator of a defendant's future behavior.[14] Indeed, a person may hold beliefs similar to defendant's and yet never act upon those beliefs in a manner that is demonstrative of that person's capacity for future dangerousness.

In this case, however, the state also introduced evidence that defendant had engaged in conduct, related to his belief in white supremacy, that demonstrated that he may be dangerous in the future. First, during the guilt phase, defendant's wife testified that, when in high school in the 1950s, defendant often fought with minority students, specifically "Japanese people and Hispanic[s] and blacks." Second, during the penalty phase, the state introduced evidence that, in

---

[14] We do not mean to say that words alone cannot be indicative of future dangerousness. Certainly, there are times when words alone *are* probative of a jury's determination under the second question. *See, e.g., State v. Williams*, 313 Or 19, 43, 828 P2d 1006, *cert den* 506 US 858 (1992) (*Williams I*), *on remand* 322 Or 620, 912 P2d 364 (1996) (a defendant's statement that "he would like to rape a 'girl'" was relevant to the second question, because that statement indicated that the defendant "may act violently toward women in the future"); *State v. Montez*, 309 Or 564, 610-11, 789 P2d 1352 (1990) (*Montez I*), *on remand* 324 Or 343, 927 P2d 64 (1996) (a defendant's statement that "'he had killed before and he was a three time loser,'" which was not accompanied by any corroborating evidence, and the defendant's confessions to other crimes, only some of which were accompanied by corroborating evidence, were relevant to the second question); *State v. Farrar*, 309 Or 132, 174-75, 786 P2d 161, *cert den* 498 US 879 (1990) (testimony concerning threats that a defendant had made toward various people was relevant to the second question).

1982, defendant had spray-painted the word "murder" three times on the doors of a synagogue. The evidence concerning both of those types of incidents, which defendant does not challenge upon review, clearly tended to show that defendant might engage in dangerous, criminal conduct in the future. *See Williams II,* 322 Or at 632 (evidence of unadjudicated bad acts is relevant and admissible under ORS 163.150(1)(b)(B)).

In our view, when considered in context with that evidence of defendant's violent and criminal conduct, the evidence concerning defendant's beliefs relating to the basis for that conduct becomes relevant under the second question, because it demonstrates that defendant has continued to hold the racist beliefs that drove him to engage in dangerous conduct in the past. The evidence at issue also demonstrates the depth with which defendant has continued to hold those beliefs. It follows, therefore, that the evidence of defendant's beliefs here relates to the extent of his propensity to act dangerously in the future. In sum, after considering all the evidence concerning defendant's belief in white supremacy, together with the evidence of his related conduct, we hold that the trial court did not err in admitting that evidence, because it was probative of defendant's future dangerousness under ORS 163.150(1)(b)(B).

█ Defendant also contends upon review that the admission of the evidence described in this section violated his right to due process under the Fifth and Fourteenth Amendments to the United States Constitution. A review of the record, however, discloses that defendant did not object to any of the evidence at issue upon due process grounds. Consequently, his constitutional argument is not preserved and we do not address it.

B. *Admissibility of Evidence Concerning Defendant's Beliefs Under the First Amendment to the United States Constitution*

Defendant next asserts that the trial court's admission of the evidence concerning his belief in white supremacy violated his right to free speech and free association under the First Amendment to the United States Constitution.[15] In

---

[15] The First Amendment provides, in part, that "Congress shall make no law * * * abridging the freedom of speech * * *; or the right of the people peaceably to

so contending, defendant refers to all the evidence described in section II.A. of this opinion, with the exception of the evidence concerning his violent and criminal conduct related to his beliefs. *See* 324 Or at 417-18 (discussing the evidence at issue). Defendant relies upon *Dawson v. Delaware*, 503 US 159, 112 S Ct 1093, 117 L Ed 2d 309 (1992), to support his contention that his First Amendment rights were violated. As we shall explain, we disagree with defendant's reading of *Dawson* and conclude that no First Amendment violation occurred in this case.

In *Dawson*, the defendant was convicted of first-degree murder. Both the defendant and his victim were white. Before the penalty phase began, the prosecution gave notice that it intended to call an expert witness to testify about the origin and nature of an organization called the Aryan Brotherhood. The prosecution also intended to introduce evidence that the defendant had the words "Aryan Brotherhood" tattooed on his hand and had a number of swastikas tattooed on his back, and also that the defendant had painted a swastika on the wall of his prison cell. 503 US at 161-62, 166. In order to preclude the testimony of the state's expert, the defendant agreed that, in lieu of that testimony, the prosecution could submit the following stipulation to the jury:

> " 'The Aryan Brotherhood refers to a white racist prison gang that began in the 1960's in California in response to other gangs of racial minorities. Separate gangs calling themselves the Aryan Brotherhood now exist in many state prisons including Delaware.' " *Id.* at 162.[16]

During the penalty phase, the prosecution read the stipulation to the jury and also introduced evidence of the

---

assemble." The First Amendment is made applicable to the states through the Due Process Clause of the Fourteenth Amendment. *New York Times Co. v. Sullivan*, 376 US 254, 264 n 4, 84 S Ct 710, 11 L Ed 2d 686 (1964).

Defendant also asserts in his brief that the evidence at issue violated his First Amendment right to "religious freedom," without further elaboration. Defendant did not make that argument before the trial court and, consequently, did not preserve that argument for review.

[16] In *Dawson*, the Court noted that, despite the defendant's agreement to the stipulation, he continued to assert that the trial court's admission of the stipulated facts violated the United States Constitution. 503 US at 162.

defendant's "Aryan Brotherhood" tattoo. However, the trial court excluded all the prosecution's swastika evidence. The prosecution introduced no other evidence that linked the defendant's Aryan Brotherhood membership to any conduct on the defendant's part or that demonstrated the specific beliefs of the Delaware prison branch of the Aryan Brotherhood. *Id.* at 162, 165-67. At the conclusion of the penalty phase, the jury recommended the death penalty and the trial court imposed it. The Delaware Supreme Court affirmed. *Id.* at 163.

The United States Supreme Court vacated and reversed the ruling of the Delaware Supreme Court, holding that "[the defendant]'s First Amendment rights were violated by the admission of the Aryan Brotherhood evidence * * *, because the evidence proved nothing more than [the defendant]'s abstract beliefs." *Id.* at 167. Defendant claims that this case is indistinguishable from the Supreme Court's holding in *Dawson*, requiring a reversal of his death sentence. We disagree.

In *Dawson*, the Supreme Court specifically framed the issue before it as "whether the First and Fourteenth Amendments prohibit the introduction in a capital sentencing proceeding of the fact that the defendant was a member of an organization called the Aryan Brotherhood, *where the evidence has no relevance to the issues being decided in the proceeding.*" *Id.* at 160 (emphasis added). Throughout its opinion, the Court emphasized that the Aryan Brotherhood evidence, *standing alone*, was not relevant to any other issue before the jury. The Court stated:

> "Even if the Delaware group to which [the defendant] allegedly belongs is racist, those beliefs, so far as we can determine, had no relevance to the sentencing proceeding in this case. *For example, the Aryan Brotherhood evidence was not tied in any way to the murder of Dawson's victim.* * * *

> "Because the prosecution did not prove that the Aryan Brotherhood had committed any unlawful or violent acts, or had even endorsed such acts, the Aryan Brotherhood evidence was also not relevant to help prove any aggravating circumstance. *In many cases, for example, associational evidence might serve a legitimate purpose in showing that a*

*defendant represents a future danger to society.* A defendant's membership in an organization that endorses the killing of any identifiable group, for example, might be relevant to a jury's inquiry into whether the defendant will be dangerous in the future. * * * But the inference which the jury was invited to draw in this case tended to prove nothing more than the abstract beliefs of the Delaware chapter [of the Aryan Brotherhood]." *Id.* at 166 (emphasis added).

The Court concluded that, because the prosecution introduced no evidence that made the defendant's membership in the Aryan Brotherhood relevant, the First Amendment "prevent[ed] Delaware * * * from employing evidence of a defendant's abstract beliefs at a sentencing hearing *when those beliefs ha[d] no bearing on the issue being tried." Id.* at 168 (emphasis added).

 As is clear from the above-quoted passages from *Dawson,* the admission in a death-penalty proceeding of evidence that concerns a defendant's belief in white supremacy does not violate the First Amendment *if* such evidence is relevant to the determination of an issue before the jury. Defendant argues that, because his beliefs had nothing to do with the murders of his in-laws, who were white, evidence concerning those beliefs was not relevant during the penalty phase of his trial. That argument is incorrect because, under *Dawson,* the admissibility of the type of evidence at issue here is not limited merely to its relevance to a defendant's guilt. Rather, the evidence also may be admissible if it is relevant "to help prove any aggravating circumstance." *Id.* at 166.

As this court has stated before, "[a] penalty phase jury is not required to 'convict' a defendant of prior crimes. Rather, the jury must decide by answering the questions required by ORS 163.150 whether a particular defendant should or should not receive a death sentence." *State v. Montez,* 309 Or 564, 611, 789 P2d 1352 (1990) (*Montez I*), *on remand* 324 Or 343, 927 P2d 64 (1996). Under ORS 163.150(1)(b)(B), one aggravating circumstance that the jury must consider is whether a defendant will be dangerous in the future. As we already have determined, the evidence in this case concerning defendant's *specific,* hostile beliefs, together with the evidence of *specific instances of conduct*

related to those beliefs, was relevant to the jury's determination under the second question. *See* 324 Or at 419 (reaching that conclusion).

The situation before us here is different, therefore, than that before the Supreme Court in *Dawson*. In that case, the prosecution introduced abstract evidence concerning the Aryan Brotherhood that was not relevant to any issue before the jury. In contrast, in this case, the state presented evidence of defendant's specific beliefs and related conduct that was probative of his future dangerousness. Consequently, under *Dawson*, the trial court's admission of the evidence at issue here did not violate defendant's First Amendment rights.

C. *Motions for Evidentiary Hearing and Mistrial Based Upon Alleged Juror Misconduct*

Defendant's next assignment of error concerns allegations of juror misconduct, which arose from the fact that one juror had a son who was an inmate, housed in a cell near defendant's cell at the Marion County Corrections Facility, during parts of defendant's trial. The record discloses the following sequence of events. Four days into the penalty phase, defendant's counsel reported to the trial court that, according to defendant, the juror had been discussing defendant's case with her son on a regular basis. At the close of testimony on that same day, the court questioned the juror, who confirmed that her son was an inmate at the Marion County Corrections Facility. In response to the court's question whether there was any basis for defendant's allegations, the juror responded:

> "Absolutely not. He [the juror's son] called me on the phone, and I have not talked to him since then, and he stated—Well, as I was talking to him I said, I've just been really really busy and I'm on jury duty now. And I knew the minute I said that I shouldn't have said it. And he immediately asked me if I—if it was this particular case. And I did lie to him. I said, no, that name does not sound familiar to me."

The juror told the court that that conversation had taken place several weeks before, near the beginning of defendant's trial. The court then stated:

"All right. The Court is satisfied that there's no conduct on your part that would interfere with the instructions I've given you in that regard."[17]

Ten days later, defendant's counsel told the trial court that a second inmate had reported that, before the jury began deliberating after the guilt phase, the same juror had told her son that defendant was guilty and was going to receive a death sentence. The court first determined, through questioning defendant's counsel, that the juror allegedly had made those statements before the court had questioned the juror about improper communications with her son. The court then stated:

"All right. With that, I'm not going to ask [the juror] to come in here and testify again because I have accepted her testimony already as absolutely credible, and I'm certainly not going to ask her to repeat that. And for the record, I do find the testimony of a juror under oath as not being put down by the statements not under oath made by not only the person we referred to before, who was that juror's son, but also a third prisoner and the Defendant, who for these purposes have no credibility for the Court."

Defendant's counsel moved to make an offer of proof, which the court denied.

The next day, defendant's counsel submitted a letter, prepared by defendant's investigator, that detailed the incidents described by the second inmate. The trial court received that letter for the purpose of defendant's offer of proof. The following day, defendant's counsel filed a motion for an evidentiary hearing on the issue, accompanied by his own affidavit. The affidavit essentially summarized the second inmate's allegations and also stated that defendant's counsel "believe[d] it [was] not only possible that [the juror] could have communicated to [her son] her feelings about the case, but that [her son] may have communicated to his mother his observations of the Defendant * * * and his activities in the Marion County Jail."

---

[17] Defendant's counsel did not question the juror, although the court gave him the opportunity to do so.

Finally, during deliberations after the penalty phase, defendant's counsel, believing that the trial court had not fully decided the issue of juror misconduct, moved for an evidentiary hearing. After the court denied that motion, defendant's counsel moved for a mistrial, which the court also denied.

Defendant assigns error to two aspects of the trial court's actions. Defendant first contends that the court erred because it "fail[ed] to allow defendant to make an offer of proof" concerning the alleged juror misconduct. In defendant's view, the court should have allowed defendant to offer the testimony of defendant, the juror's son, and the second inmate.

We disagree that the trial court denied defendant an opportunity to make a sufficient offer of proof. Although defendant correctly asserts that one method of making an offer of proof is through witness testimony, by question and answer, "[i]t also is acceptable * * * for a party's counsel to state what the proposed evidence is expected to be." *State v. Phillips*, 314 Or 460, 466, 840 P2d 666 (1992). In this case, the trial court accepted the letter of defendant's investigator, which summarized an interview with the second inmate, and also heard the arguments of defendant's counsel, which specified the substance of the alleged communications between the juror and her son. The court also had before it the affidavit of defendant's counsel that reiterated the second inmate's allegations. Taken together, we conclude that the trial court had sufficient information to make its determination concerning the alleged misconduct and that defendant offered sufficient information to complete the record for purposes of review. In other words, "the offer of proof was sufficient to demonstrate the content of the evidence sought to be admitted." *Phillips*, 314 Or at 466.

Next, defendant contends that the trial court erred in denying his motion for a mistrial or, alternatively, that the court erred in refusing to hold an evidentiary hearing on the issue of juror misconduct. The decision to grant or deny a motion for a mistrial "is addressed to the sound discretion of the trial judge, who is in the best position to assess and to rectify the potential prejudice to the defendant." *State v. Pratt*,

316 Or 561, 574, 853 P2d 827, *cert den* 510 US 969 (1993) (*Pratt II*) (internal quotation marks omitted). Accordingly, we review the denial of defendant's motion for a mistrial for an abuse of discretion. *Ibid.* Because the trial court's decision to deny defendant's motion for an evidentiary hearing required similar judgment on the trial judge's part, we also review that decision for an abuse of discretion. *See State v. Wright*, 323 Or 8, 20, 913 P2d 321 (1996) (reviewing a trial court's ruling that denied the defendant's post-verdict motion to contact jurors to investigate misconduct for abuse of discretion).

■ We disagree with defendant that the trial court abused its discretion in denying defendant's motions. After learning of the alleged communications between the juror and her son, the court immediately questioned the juror and satisfied itself that no misconduct had occurred. When defendant's counsel brought the matter to the court's attention a second time, the court specifically stated that it had found the juror's testimony to be credible and saw no need to question the juror any further.

In similar cases, this court has deferred to trial court determinations of the extent of misconduct or prejudice to a defendant and also to trial court assessments of juror credibility. *See, e.g., Pratt II*, 316 Or at 574-75 (no abuse of discretion when "the trial court carefully assessed whether [inappropriate] comments by [an] alternate juror could have caused any possible prejudice to defendant [and] * * * concluded that no harm had been done"); *State v. Rogers*, 313 Or 356, 382, 836 P2d 1308 (1992), *cert den* 507 US 974 (1993) (no abuse of discretion when the record supported the trial court's finding, after the questioning of a juror who had been contacted by the mother of a victim, "that [the] juror * * * was not contaminated by the contact and could still serve as an impartial juror"). As in those cases, we conclude here that the trial court did not abuse its discretion when it denied defendant's motions.

D. *Requested Jury Instructions Relating to Sympathy for Defendant*

■ Defendant's next assignment of error concerns the trial court's refusal to give four of defendant's requested jury

instructions, all of which pertained to juror sympathy toward defendant. We review a trial court's refusal to give a requested jury instruction for error as a matter of law. *State v. Brown*, 310 Or 347, 355, 800 P2d 259 (1990). However, we review a trial court's choice among requested jury instructions that supply the same information for abuse of discretion. *State v. McDonnell*, 313 Or 478, 496, 837 P2d 941 (1992) (*McDonnell II*).

■ Defendant's first requested instruction drew a distinction between the role of juror sympathy in the guilt and penalty phases of defendant's trial and further instructed the jury that "a decision that death is not appropriate may be made on the basis of sympathy for the Defendant *if that sympathy is based on mitigating evidence*." (Emphasis added.) Although the trial court did not give that instruction, the court properly instructed the jury about the impact of sympathy for defendant based upon mitigating evidence, as set forth in ORS 163.150(1)(c)(B).[18] Because the court so instructed the jury, we conclude that it neither erred nor abused its discretion in refusing to give defendant's requested instruction. *See State v. Tucker*, 315 Or 321, 332, 845 P2d 904 (1993) (stating that "[i]t is not error for a trial court to refuse to give a requested instruction if the instruction given by the court, although not in the form requested, adequately covers the subject of the requested instruction").

■ Defendant's other requested instructions stated that, in determining the appropriate sentence, the jurors may be influenced by feelings of sympathy or mercy toward defendant, even if those feelings were *not* based upon any mitigating evidence. Defendant contends that the requested instructions properly explained that sympathy for the defendant is an appropriate consideration in the penalty phase. The state argues that, under *Moen*, 309 Or 45, in which this court approved an *anti*-sympathy instruction, defendant's

---

[18] ORS 163.150(1)(c)(B) provides:

"In determining the issue [under the fourth question], the court shall instruct the jury to answer the question 'no' if one or more of the jurors find there is any aspect of the defendant's character or background, or any circumstances of the offense, that one or more of the jurors believe would justify a sentence less than death."

requested instructions were improper. We agree with the state.

In *Moen*, this court approved a jury instruction that stated, in part, that the jurors were "not to allow any bias, sympathy, or prejudice any place in [their] deliberations." 309 Or at 87, 93. In finding that instruction to be proper, this court specifically discussed whether it was permissible for a penalty-phase instruction to appeal generally to the jurors' sympathy and concluded that such an instruction would be impermissible. *Id.* at 91-93. In doing so, the court stated that "general sympathy, or any emotionalism, has no place in a capital sentencing decision, just as it has no place in the jury's deliberations during the guilt phase." *Id.* at 92. Rather, any instruction that appeals to the jurors' sympathies also must instruct the jurors that such sympathy must be based upon the mitigating evidence before them. *Id.* at 93.

Although *Moen* concerned an anti-sympathy instruction, its reasoning is applicable here. Consequently, we conclude that, as a matter of law, the trial court properly refused to give defendant's requested instructions.

E. *Requested Jury Instruction Relating to the Ultimate Issue*

Defendant also assigns error to the trial court's refusal to give his requested instruction concerning the "ultimate issue" of whether defendant should receive the death penalty. The requested instruction was as follows:

> "Under the Oregon death penalty law, you jurors make the ultimate decision as to whether [defendant] will live or die. As part of your role in deciding this question[ ], you must make a decision about the appropriateness of the punishment of death in this case. That means that in addition to deciding the answer to the four questions I have just read to you, you must also decide whether or not death is appropriate in [defendant]'s case. Therefore, I instruct you that you may answer the four question[s] 'no' in good conscience if you feel that the answer to the question is 'yes,' but the circumstances of this case lead you to a personal belief that death is not the appropriate sentence for [defendant]."

Although the trial court did not give that instruction, it did instruct the jury that it must answer the first three questions

under ORS 163.150(1)(b) "yes" if the state met its burden of proof on those questions and that, if the jury also answered the fourth question in the affirmative, "the sentence will be death." The court also instructed the jury that, if it answered "no" to any of the four questions, the sentence would be either life imprisonment without the possibility of parole or imprisonment with a minimum 30-year term.

We disagree with defendant that the trial court erred in refusing to give his requested instruction. In *Tucker*, 315 Or 321, this court rejected a similar assignment of error concerning a requested instruction that related to the jury's "'ultimate decision' whether [the] defendant would live or die." 315 Or at 332. The following reasoning from *Tucker* also applies in this case:

> "The trial court instructed the jury that, if it answered the questions in the affirmative, *'the law requires that the penalty shall be death'* (emphasis added) and that, if it answered [any or all] of the questions in the negative, 'the law requires that the penalty shall be life imprisonment.' Those instructions accurately conveyed to the jury its role in determining [the] defendant's sentence. That was enough. * * * The trial court did not err in refusing to give defendant's requested jury instructions concerning the jury's role in determining defendant's sentence." *Ibid.* (emphasis in original; citations omitted).

We hold that the trial court neither erred nor abused its discretion in refusing to give the requested instruction.

## F. *Constitutionality of Oregon's Death Penalty Statutes*

Finally, defendant contends that the trial court erred in overruling his demurrer to the indictment, which challenged the constitutionality of Oregon's death penalty statutes upon several different grounds. We address only one of defendant's constitutional arguments here, concerning post-verdict judicial review of the jury's decision to impose the death penalty.[19]

---

[19] As to defendant's remaining constitutional challenges, defendant concedes that this court has rejected similar challenges in other cases. We adhere to those prior rulings and, because further discussion would benefit neither bench nor bar, decline to discuss defendant's other arguments.

In defendant's view, Oregon's death penalty statutes do not allow for meaningful judicial review of a jury's decision to impose the death penalty. He specifically focuses upon the fourth question—"[w]hether the defendant should receive a death sentence"—and contends that, because that question "merely asks the jury's opinion," neither the trial nor the appellate court is able to review a jury's determination under that question. Defendant contends further that such a lack of opportunity for judicial review violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution.[20] As we shall explain, because we conclude that judicial review of a jury's determination under the fourth question is available, we reject defendant's constitutional argument.[21]

We begin by discussing the nature of post-verdict judicial review generally available in criminal cases. In addition to the type of review available through direct appeal or a post-conviction relief proceeding, a criminal defendant may, through a motion for a judgment of acquittal, request judicial review of a guilty verdict in order to determine whether sufficient evidence supported that verdict. *See State v. Stroup*, 290 Or 185, 204-05, 620 P2d 1359 (1980) (rejecting a defendant's insufficient-evidence challenge because the defendant's motion for judgment of acquittal was based upon other grounds). In criminal cases,

---

[20] The Due Process Clause of the Fourteenth Amendment provides: "No State shall * * * deprive any person of life, liberty, or property, without due process of law."

[21] Defendant's argument also appears partially to rely upon Article VII (Amended), section 3, of the Oregon Constitution. That provision provides, in part: "In actions at law, * * * no fact tried by a jury shall be otherwise re-examined in any court of this state, unless the court can affirmatively say there is no evidence to support the verdict."

In *State v. Wagner*, 305 Or 115, 167-69, 752 P2d 1136 (1988), *vacated and remanded on other grounds* 492 US 914, 109 S Ct 3235, 106 L Ed 2d 583 (1989) (*Wagner I*), *on remand* 309 Or 5, 786 P2d 93, *cert den* 498 US 879 (1990), this court rejected the assertion that Article VII (Amended), section 3, precluded meaningful judicial review in death penalty cases. We note, however, that this court decided *Wagner I* before the legislature enacted ORS 163.150(1)(b)(D). Consequently, because defendant's argument here turns upon the enactment of the fourth question, we again must address the issue whether judicial review of a jury's decision to impose the death penalty is available.

"[t]his court reviews questions of the sufficiency of the evidence \* \* \* by examining the evidence in the light most favorable to the state to determine whether a rational trier of fact, accepting reasonable inferences and reasonable credibility choices, could have found the essential element of the crime beyond a reasonable doubt. \* \* \* This court's decision is not whether we believe that defendant is guilty beyond a reasonable doubt, but whether the evidence is sufficient for the jury to so find." *State v. Cunningham*, 320 Or 47, 63, 880 P2d 431 (1994), *cert den* 514 US 1005 (1995) (internal citation omitted).

The United States Supreme Court has determined that the "rational juror" standard, such as that quoted above, satisfies the commands of due process under the Fourteenth Amendment. *Jackson v. Virginia*, 443 US 307, 324, 99 S Ct 2781, 61 L Ed 2d 560 (1979). Indeed, the Supreme Court's decision in *Jackson* is the genesis for the "rational juror" standard applied to criminal cases in Oregon. *See State v. Harris*, 288 Or 703, 721, 609 P2d 798 (1980) (discussing application of that standard in the light of *Jackson*).[22]

The "rational juror" standard applies to a jury's decision to impose the death penalty, as well as to criminal convictions. *See Wagner I*, 305 Or at 169 (concluding that, "from the decisions of the [United States] Supreme Court[,] \* \* \* our review must be to determine whether there was evidence from which the jury could have found affirmative answers to [the first] three questions *and whether the jury acted according to the law*," which includes the reasonable doubt requirement for those three questions (emphasis added)); *see also Montez I*, 309 Or at 608 (stating that "[t]he scope of appellate review in death penalty cases is the same as in all other criminal cases"). For example, in response to a sufficiency-of-evidence challenge to any one of the first three questions set forth in ORS 163.150(1)(b)(A), (B), or (C), a court must determine whether, based upon the evidence presented, a rational juror could have found beyond a reasonable doubt that a defendant acted deliberately, or would be dangerous in the

---

[22] We also note that the "rational juror" standard of review is more stringent than the "no evidence" standard set forth in Article VII (Amended), section 3, of the Oregon Constitution. *See Harris*, 288 Or at 721 (contrasting the standard set forth in *Jackson* with that set forth in Article VII (Amended), section 3).

future, or acted in response to provocation by the victim. The issue here is whether the "rational juror" standard is applicable to the fourth question, which, unlike the first three questions, is not subject to a burden of proof. *See* ORS 163.150(1)(d) (setting forth the burden of proof requirements for the first three questions); *Guzek II*, 322 Or at 255 (noting that neither party bears any burden of proof on the fourth question).

■ We first emphasize that the fourth question does not carry a burden of proof, "because it does not present an issue subject to proof in the traditional sense, rather[,] it frames a *discretionary* determination for the jury." *State v. Wagner*, 309 Or 5, 18, 786 P2d 93, *cert den* 498 US 879 (1990) (*Wagner II*) (emphasis added). Indeed, the legislature enacted the fourth question in order to comply with the requirements of the Supreme Court's decision in *Penry v. Lynaugh*, 492 US 302, 327-28, 109 S Ct 2934, 106 L Ed 2d 256 (1989), which concluded that the Eighth Amendment limits a state's ability to narrow jury discretion in considering mitigating evidence. *State v. Stevens*, 319 Or 573, 581, 879 P2d 162 (1994) (*Stevens II*). *See generally Johnson v. Texas*, 509 US 350, 359-62, 113 S Ct 2658, 125 L Ed 2d 290 (1993) (discussing the Supreme Court's case law concerning the Eighth Amendment and the requirement of guided jury discretion in determining whether to impose the death penalty).

■ In short, the fourth question asks the jury to make a *discretionary* determination to answer the question whether a defendant should receive the death sentence. It is significant, however, that the jury is guided by the following requirement set forth in ORS 163.150(1)(c)(B):

"In determining the issue [under the fourth question], the court shall instruct the jury to answer the question 'no' if one or more of the jurors find there is any aspect of the defendant's character or background, or any circumstances of the offense, that one or more of the jurors believe would justify a sentence less than death."

As that instruction makes clear, a jury's discretionary determination under the fourth question must be based upon the evidence presented at trial. *See also Moen*, 309 Or at 93 (stating that the jury properly was instructed "to make a reasoned

resolution of the statutory questions based solely on the aggravating and mitigating evidence before [the jury]").

■ In our view, judicial review of a jury's decision to impose the death penalty is not foreclosed by the discretionary nature of the fourth question, nor by the absence of a burden-of-proof requirement for that question. As the preceding paragraph demonstrates, although the fourth question is discretionary and not subject to a burden of proof, a jury's decision under that question still must be based upon the evidence presented at trial. Consequently, we conclude that a court may review a jury's decision under the fourth question in order to determine whether, in view of the evidence, a rational juror, accepting reasonable inferences and reasonable credibility choices, could have concluded that the defendant should be sentenced to death. That standard recognizes the role of juror discretion in imposing the death penalty, while also providing for judicial review to ensure that a jury's decision rationally is based upon the evidence presented. Because such judicial review is available, defendant's due process argument, which depends upon the *lack* of opportunity for judicial review, is without foundation.

We also reject defendant's assertion that, in the light of the Supreme Court's decision in *Honda Motor Co. v. Oberg,* 512 US 415, 114 S Ct 2331, 129 L Ed 2d 336 (1994), we must conclude here that Oregon's death penalty statutes unconstitutionally preclude post-verdict judicial review. In *Oberg,* the Supreme Court held that, as applied to punitive damages awards, Article VII (Amended), section 3, of the Oregon Constitution, violated the Due Process Clause of the Fourteenth Amendment, because the *amount* of a punitive damages award was not subject to judicial review under Article VII (Amended), section 3, if any evidence supported awarding punitive damages. 512 US at 418. Defendant contends that "*Oberg* * * * provides criminal defendants with a compelling argument that they are entitled to post-verdict excessiveness review of jury-imposed criminal sanctions." For the reasons that follow, we disagree.

First, *Oberg* concerned an entirely different issue—punitive damages—from the issue here. Indeed, the Supreme

Court specifically focused upon Oregon's departure from traditional procedures of reviewing punitive damages awards in concluding that Oregon's lack of judicial review violated due process. *See Oberg*, 512 US at 421-29 (discussing traditional procedures for reviewing punitive damages awards and contrasting Oregon's statutory approach). Secondly, on remand from the Supreme Court, this court concluded that the appropriate post-verdict standard of review of punitive damages awards, under Article VII (Amended), section 3, was to determine whether the award "[was] within the range that a rational juror would be entitled to award in the light of the record as a whole." *Oberg v. Honda Motor Co.*, 320 Or 544, 549, 888 P2d 8 (1995), *cert den* ____ US ____, 116 S Ct 1847, 134 L Ed 2d 948 (1996). That standard is similar to the standard that we have concluded applies in this case: Whether a rational juror, considering all the evidence, could conclude that a defendant should be sentenced to death. Thirdly, as we already have discussed, Oregon's "rational juror" standard of review in criminal cases is not grounded in Article VII (Amended), section 3, which was the provision at issue in *Oberg*. Rather, that standard derives from the Supreme Court's decision in *Jackson v. Virginia*. Finally, we note that, unlike in the context of punitive damages, the United States Supreme Court never has held that the Due Process Clause requires "excessiveness" review in death-penalty cases. In short, we disagree with defendant's assertion that *Oberg* compels a different outcome here.

■ Our final step in addressing defendant's assignment of error is to apply the "rational juror" standard of review, as set forth above, to the jury's decision to impose the death penalty in this case. We first note that, although defendant raised the constitutional issue discussed above at trial, he did not raise the issue whether the evidence in this case was insufficient to support the jury's answer to the fourth question. Despite defendant's failure to preserve that issue, however, we conclude, after reviewing the evidence, that a rational juror, accepting all reasonable inferences and reasonable credibility choices, could have concluded that defendant should receive the death penalty. Accordingly, we reject defendant's contention in this assignment of error that we should vacate his sentence of death.

## VI. CONCLUSION

In summary, we conclude that none of defendant's assignments of error relating to either phase of his trial is well taken. Consequently, we affirm defendant's convictions for aggravated murder, murder, kidnapping, and burglary, and we also affirm the sentence of death.

The judgment of conviction and sentence of death are affirmed.

**FADELEY, J.,** dissenting.

I dissent because of the majority's rulings that evidence of political beliefs and passing out a "political pamphlet" is admissible in evidence with respect to future dangerousness in this case. 324 Or at 417.

I do not agree that labeling a person's social or political beliefs should be permitted in the death-penalty phase of an aggravated murder case, however aberrant or abhorrent those beliefs may be, or that evidence of passing out a political pamphlet should be so admitted. The label "neo-Nazi" is not merely cumulative of another type of labeling, *i.e.*, "white supremacist." Those terms may convey different, but still prejudicial, thoughts to a juror. Basing future dangerousness on political beliefs (rather than on violent conduct) is a net that, from the point of view of King George III, would have caught at least some of the founders of this country who expressed themselves against the colonial government in their time. The founders sought to leave all that behind. We should heed their lesson.

Further, I do not see that evidence of defendant's social or political beliefs is "tied in any way to the murder"[1] of defendant's wife's parents. That was not a political act but was a family affair. The family, not political beliefs, is the source of the passion and anger here.

I respectfully dissent.

---

[1] The wording quoted is from *Dawson v. Delaware,* 503 US 159, 166, 112 S Ct 1093, 117 L Ed 2d 309 (1992).