Argued and submitted March 3, affirmed May 11, appellant's petition for
reconsideration filed June 17 allowed by opinion August 17, 2005
See 201 Or App 217 (2005)

# JESSE CLARENCE PRATT,
*Appellant,*

*v.*

# Nicholas ARMENAKIS,
Superintendent,
Oregon State Penitentiary,
*Respondent.*

## 93C-13559; A107068

112 P3d 371

Kathleen M. Correll argued the cause for appellant. On the brief was Eric M. Cumfer.

Timothy A. Sylwester, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Haselton, Presiding Judge, and Brewer, Chief Judge,* and Ortega, Judge.

HASELTON, P. J.

---

* Brewer, C. J., *vice* Richardson, S. J.

## HASELTON, P. J.

Petitioner appeals the denial of his petition for post-conviction relief, asserting that the post-conviction court erred in rejecting his claim that he had inadequate assistance of counsel at his criminal trial and on direct appeal of his conviction for aggravated murder. Petitioner also has filed an emergency motion to remand this case because he wishes to amend his petition for post-conviction relief to allege a claim, based on *Atkins v. Virginia*, 536 US 304, 122 S Ct 2242, 153 L Ed 2d 335 (2002), that he is ineligible to receive the death penalty on the ground that he is mentally retarded. For the reasons set forth below, we deny petitioner's emergency motion and affirm the decision of the trial court.

Petitioner was convicted in 1991 of the aggravated murder of Carrie Love and was sentenced to death. The conviction and sentence were affirmed on direct review. *State v. Pratt*, 316 Or 561, 853 P2d 827, *cert den*, 510 US 969 (1993) (*Pratt II*).[1] In *Pratt II*, the court briefly recounted the circumstances of Love's murder:

"[Petitioner] owned and operated a trucking company in Seattle. Love, who was one of [petitioner's] employees, agreed to accompany [petitioner] in his truck on a trip to Los Angeles to open a new office. Love was concerned that [petitioner] might make sexual advances toward her during the trip, but she told her boyfriend that, if [petitioner] did make such advances, she would get out of the truck and call her boyfriend.

"[Petitioner] and Love left Seattle on June 16, 1986. On June 17, a passerby discovered a sleeping bag and a pillowcase in a ditch beside Highway 97 north of Klamath Falls. The pillowcase contained Love's purse and identification. The passerby turned the items over to the Oregon State Police. The next day, the police found Love's nude body at a truck turnout along Highway 97 south of the location where her purse was found. Love had been stabbed, asphyxiated, and run over by a vehicle."

[1] Petitioner previously had been convicted of that crime and sentenced to death, but the judgment was reversed and the case remanded for a new trial due to evidentiary error. *State v. Pratt*, 309 Or 205, 785 P2d 350 (1990) (*Pratt I*).

*Id.* at 565. After petitioner's arrest, he told a police officer that he had had sex with the victim at a truck stop and then arranged for her to fly to Los Angeles to meet him. Petitioner subsequently told several people that he had killed the victim. Petitioner was convicted of aggravated murder.

During the penalty phase of the trial, the trial court admitted evidence concerning prior instances of petitioner's violence toward women, including beating, threatening, and kidnapping women and forcibly promoting prostitution. Evidence also was admitted concerning petitioner's violence and threats toward men. Several of petitioner's family members testified that petitioner had threatened to harm his mother, one of his half-sisters, and his half-sister's children.

Petitioner's evidence during the penalty phase included testimony by psychologists Faulder Colby and Ralph Underwager. Colby is a neuropsychologist who examined petitioner to determine whether he had brain damage. Colby explained at length to the jury how various parts of the brain are responsible for various functions and how injury to various parts of the brain can cause behavioral problems. He further observed that behaviors that some might simply consider mean actually are the result of brain dysfunction.

Colby described the tests that he administered to petitioner and described in general petitioner's performance on those tests. Colby tested petitioner's full-scale IQ as 77, which he described as "borderline." He observed that petitioner did quite poorly on tests involving the frontal lobe, which concerns executive functioning or behavior control. The test results indicated organic brain damage, but Colby was unable to tell when the damage had occurred.

Colby rendered the opinion that petitioner had a severe cognitive disorder. He gave a provisional diagnosis of an explosive type of organic personality disorder. Although Colby believed that petitioner had organic brain damage, he speculated that petitioner's brain damage was caused by a closed head injury that did not involve a massive contusion to the brain. The results of a CT scan test that was performed at Colby's request were insufficient to confirm such a condition. Colby opined that, although petitioner was dangerous and could not function well in society, he historically had been

able to function well within a structured prison environment. Colby also indicated that he believed that medication can reduce assaultive behaviors.

Underwager is a clinical psychologist who specializes in sexual abuse cases. He testified that he had interviewed and tested petitioner and concluded that petitioner had suffered from extensive childhood sexual abuse. In Underwager's opinion, that abuse had resulted in petitioner engaging in dysfunctional and abusive sexual relationships, some of which involved a certain type of sadomasochistic sexual behavior.[2] Underwager further explained that individuals who are exposed to violent, long-term sexual abuse, as petitioner was, are more likely to have anger and aggression problems. Underwager's tests of petitioner also showed evidence of brain damage.

Ultimately, as noted above, petitioner was sentenced to death, and the conviction and sentence were affirmed on review. *Pratt II*, 316 Or at 583.

In 1994, petitioner initiated this action for post-conviction relief, alleging that trial counsel in his 1991 trial and appellate counsel in the ensuing direct review provided constitutionally inadequate assistance. The post-conviction court denied relief, making extensive findings of fact and conclusions of law, discussed more fully below.[3] After the case was briefed and shortly before oral argument, petitioner filed an emergency motion to remand this case to the post-conviction court so that he could raise a new matter, *viz.*, whether *Atkins* (which was decided in 2002, after the post-conviction court had entered its judgment) precludes the

---

[2] That evidence was relevant because the sexual behavior in question involved knitting needles, and the victim in this case was stabbed with a long, thin object that was consistent with a knitting needle.

[3] The post-conviction court's judgment was entered in June 1999. In February 2001, this court entered an order denying petitioner's request to file a 260-page brief, but allowed petitioner to file a 150-page brief, extending the 50-page limit prescribed in ORAP 5.05(2)(a). The Oregon Supreme Court affirmed this court's order. *Pratt v. Armenakis*, 335 Or 35, 56 P3d 920 (2002). Petitioner then filed his opening brief in June 2003, but, due to further motions and a substitution of petitioner's counsel, the case was not argued and submitted for decision until March 2005.

imposition of a death sentence. Because resolution of petitioner's motion could obviate the need to consider petitioner's remaining assignments of error, we turn first to that motion.

■     Petitioner's current appellate counsel, who assumed sole responsibility for the case in September 2004, asserts in support of petitioner's motion that, as she was preparing for oral argument, she first came to believe that there is a legitimate issue as to whether petitioner is mentally retarded and, thus, under *Atkins*, ineligible for execution. Counsel acknowledges that most medical definitions indicate that mild mental retardation may be diagnosed in individuals with IQ scores of 70 or below. Counsel points out that, at various points in petitioner's life, IQ tests have indicated that he has an IQ of anywhere from 70.5 to the low 80s. Counsel argues that, because the standard error of measurement for IQ tests may be as much as five points, it is possible that, under *Aktins*'s analysis, petitioner's cognitive deficiency at the time of the crime was sufficiently severe to preclude imposition of a death sentence.

In response to petitioner's motion, defendant points out that this case was pending in the post-conviction court for approximately five years and has, to date, been pending on appeal for an additional five years, and that a remand to allow petitioner to allege and attempt to prove an entirely new claim would cause an even more extraordinary delay. Defendant further contends that ORS 138.550(3) provides the only means by which petitioner may bring his claim concerning *Atkins*. ORS 138.550(3) provides:

> "All grounds for relief claimed by petitioner in a petition pursuant to ORS 138.510 to 138.680 must be asserted in the original or amended petition, and any grounds not so asserted are deemed waived *unless the court on hearing a subsequent petition finds grounds for relief asserted therein which could not reasonably have been raised in the original or amended petition.* However, any prior petition or amended petition which was withdrawn prior to the entry of judgment by leave of the court, as provided in ORS 138.610, shall have no effect on petitioner's right to bring a subsequent petition."

(Emphasis added.) Defendant suggests that ORS 138.550(3) establishes that where, as here, a post-conviction court has rendered a decision that is on appeal, a petitioner has no further ability to amend the original petition—and may raise a new claim only by filing a subsequent petition for post-conviction relief.

Petitioner acknowledges, at least implicitly, that the relief that he is requesting in his emergency motion is unprecedented. He asserts, however, that this court should undertake to grant an extraordinary remedy of remand to add a new claim to his petition because there is some doubt as to whether he could successfully pursue a successive petition under the standards set forth in ORS 138.550(3).

We agree with defendant. Under controlling statutes, we lack the authority to grant the relief that petitioner seeks. ORS 138.650, which provides for appeals in post-conviction cases, provides that the scope of review in the appellate courts "shall be the same as that provided by law for appeals in criminal actions[.]" ORS 138.010 provides that the "only mode of reviewing a judgment or order in a criminal action is that prescribed by ORS 138.010 to 138.310." ORS 138.220, in turn, provides for our scope of review: "Upon an appeal, the judgment or order appealed from can be reviewed *only as to questions of law appearing upon the record.*" (Emphasis added.) ORS 138.240 provides that we "may reverse, affirm or modify the judgment or order appealed from and shall, if necessary or proper, order a new trial."

Read together, those statutes indicate that, in a post-conviction appeal, this court may reverse, affirm, or modify the judgment of the post-conviction court only if we find error as to an issue "appearing upon the record." ORS 138.220.[4] Here, petitioner's emergency motion to remand is not based upon anything that "appear[s] upon the record." Rather, petitioner seeks to raise an entirely new claim (and presumably develop a new record) concerning an issue that was not raised in his pleadings or at the post-conviction trial.

---

[4] ORS 138.227 provides an exception that is not applicable here, allowing this court to vacate a judgment and remand a case upon joint motion of the parties.

Thus, we have no authority to vacate a post-conviction judgment and remand a case to a post-conviction court for the sole purpose of allowing the petitioner to amend the petition to raise a new claim for post-conviction relief.[5]

We turn to the merits of petitioner's appeal. Petitioner first asserts that the post-conviction court erred in concluding that he was not denied the right to adequate assistance of *trial* counsel as guaranteed by the Oregon Constitution or the United States Constitution. Article I, section 11, of the Oregon Constitution guarantees a criminal defendant the right to adequate assistance of trial counsel. To establish a violation of that provision, a post-conviction petitioner must show, by a preponderance of the evidence, facts demonstrating that (1) trial counsel failed to exercise reasonable professional skill and judgment, and (2) counsel's failure had a tendency to affect the result of the criminal trial. *Stevens v. State of Oregon,* 322 Or 101, 110, 902 P2d 1137 (1995); *Trujillo v. Maass,* 312 Or 431, 435, 822 P2d 703 (1991). Under the Sixth and Fourteenth Amendments to the United States Constitution, denial of adequate assistance of counsel is demonstrated when a petitioner shows that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington,* 466 US 668, 104 S Ct 2052, 80 L Ed 2d 674 (1984).

On appeal, petitioner asserts that the post-conviction court erred because he established four different ways in which trial counsel in his 1991 trial were constitutionally inadequate: (1) Trial counsel provided inadequate assistance during the penalty phase of the trial because they failed to adequately investigate petitioner's mental condition by having an event-related potential brain function test performed.[6] (2) In a somewhat related manner, trial counsel were inadequate in the penalty phase for failing to present additional evidence concerning petitioner's brain damage. (3) Trial counsel were inadequate for failing to request a

---

[5] Given our disposition, we express no opinion as to whether petitioner can successfully file a successive petition for post-conviction relief pursuant to ORS 138.550(3).

[6] A witness in the post-conviction proceeding explained that event-related potential brain testing involves interpretation of electroencephalogram results that have been averaged over several types of trials.

hearing to determine whether petitioner was unfit to proceed to trial due to incapacity, pursuant to ORS 161.630. In particular, petitioner asserts that his refusal to accept a plea bargain for life imprisonment should have alerted his trial counsel that he was mentally unfit to proceed to trial. And (4), trial counsel were inadequate because they did not assert an insanity defense during the guilt phase of the trial.

■    We turn to petitioner's first and second arguments, concerning whether counsel failed to adequately develop evidence that petitioner suffered from brain damage. Petitioner was represented at trial by Kenneth Hadley and Enver Bozgoz. At the post-conviction trial, petitioner presented evidence from a psychological researcher, Joel Alexander, who conducts research on cognitive and brain functions. Alexander testified about a test called "event-related potential." He noted that very few psychologists provide forensic testimony concerning event-related potential but that the technique did exist in 1991 when petitioner went to trial. Alexander testified that he performed both electroencephalogram and "event-related potential" tests on petitioner in 1997 and determined that, during the "event-related potential" tests, there was an unusual length of time between the onset of a stimulus and the brain's reaction to the stimulus. In light of the test results and answers provided by petitioner on a survey, Alexander concluded that there was a significant possibility that petitioner had brain damage, but Alexander was unable to determine when that brain damage had occurred. Ultimately, Alexander agreed that his findings were consistent with Colby's and Underwager's findings— that petitioner had brain damage of undetermined origin.

Petitioner argues that, if his criminal trial counsel had obtained "event-related potential" testing to confirm Colby's and Underwager's conclusions that petitioner had brain damage, the jury might have been less likely to believe testimony by several of his relatives that petitioner had claimed to be able to fake mental problems—and, conversely, the jury might have been more likely to accept that petitioner had brain damage. In that regard, petitioner points to the prosecutor's remarks to the jury in closing argument that emphasized the evidence that petitioner claimed to be able to fake mental health problems.

In rejecting petitioner's argument regarding "event-related potential" testing, the post-conviction court found that additional testing "would have shown nothing more than what was already observed by Dr. Colby during his two-day examination of petitioner." The post-conviction court further found:

"13.  Following his evaluation, Dr. Colby recommended that counsel obtain an imaging study of petitioner's brain. Counsel followed the recommendation and obtained a CT scan.

"14.  Dr. Colby did not tell counsel that a CT was not a sufficient imaging study. In [the] absence of any indication from the expert they had retained to evaluate petitioner's mental health that the imaging study they had obtained was not an adequate follow-up on his recommendation to obtain an imaging study, counsel reasonably concluded a CT scan was adequate to follow up on Dr. Colby's recommendation."

We agree with the post-conviction court that counsel's reliance on Colby's testimony, Underwager's testimony, and the CT scan did not amount to constitutionally deficient performance. The factual findings underlying the post-conviction court's determination in that regard are supported by evidence in the record and, thus, are controlling. *See Ball v. Gladden*, 250 Or 485, 487-88, 443 P2d 621 (1968). We note, particularly, that the additional evidence that petitioner asserts that counsel should have presented would merely have supplemented the existing expert testimony with additional expert testimony as to the same conclusion—*viz.*, that petitioner had brain damage.

■ Petitioner also argues that his trial counsel should have presented expert testimony that the particular sadomasochistic sexual behavior in which petitioner had engaged is often the product of psychosis and can be a symptom of brain injury. As noted above, Underwager testified in the penalty phase of the trial that he believed that petitioner's sadomasochistic behavior was the result of childhood sexual abuse. *See* 199 Or App at 452. Moreover, he stated that the existence of that particular behavior validated his conclusion that petitioner had been sexually abused, noting that the behavior in question is a preadolescent sexual behavior that

persists into adulthood primarily in those who have been sexually abused by adult males. In light of Underwager's testimony that the sadomasochistic behavior was related to childhood sexual abuse, it was a reasonable tactical choice in the penalty phase for counsel not to present contradictory evidence to the jury about a different cause for that behavior.

To summarize, during the penalty phase of petitioner's trial, the state presented a great amount of evidence that petitioner had been extremely violent toward many people in the past, and that that violence—including sexual violence—had been directed primarily against women. Petitioner presented evidence that he suffered from headaches, had experienced childhood sexual abuse, would often erupt quickly into anger for no apparent reason, and would often make up stories. As noted above, petitioner also presented evidence from Colby and Underwager concerning his mental condition. That evidence indicated that petitioner had borderline intelligence, a type of brain damage that results in impaired ability to control behavior, and a history of violence toward women that may have been related to the childhood sexual abuse. Although petitioner contends that counsel was inadequate for failing to present additional evidence, that evidence would not have materially enhanced—and, in some particulars, may have detracted from—the substantial evidence that counsel did adduce. The post-conviction court correctly concluded that trial counsel did not provide inadequate assistance in failing to adduce the additional evidence that petitioner now contends should have been presented.

■ Petitioner next argues that the post-conviction court erred in rejecting his claims that his trial counsel were constitutionally inadequate because they failed to ask the trial court to conduct a hearing to determine whether petitioner was competent to aid and assist in his defense. Under ORS 161.360 to 161.370, if a court has "reason to doubt" a criminal defendant's fitness to assist and cooperate with trial counsel, it is required to obtain a psychiatric or psychological examination of the defendant and make a determination as to the defendant's fitness to proceed. If a defendant is determined not fit to proceed, then the criminal proceedings are suspended and the person is remanded to the custody of a state mental hospital or released on supervision. ORS 161.370.

Evidence presented at the post-conviction trial showed that, before the 1991 criminal trial, the court, at trial counsel's request, entered an order authorizing petitioner's examination by a psychologist at state expense. Petitioner was referred to Dr. Art Norman, who ultimately referred petitioner's case to Colby. Colby evaluated petitioner for two days and issued a 35-page psychological evaluation. Colby based his conclusions on a diagnostic interview, a review of medical, legal, and academic records, and the results of 17 different tests that he administered to petitioner. Colby's evaluation included the following statement:

> *"Mr. Pratt appeared to understand how the court procedure worked as well as to have a solid understanding of how his relationship should be with his attorneys.* He trusts his attorneys, although perhaps Mr. [Bozgoz] more than Mr. Hadley. He likes Mr. [Bozgoz's] coarse and tough style. He said he thought his best defense would be an insanity case. He knows he is not crazy, but he also knows that something is wrong. He does not know what is wrong, but he gets angry quickly and then becomes calm. He said these things did not happen before the truck hit him. If found guilty, Mr. Pratt said he would prefer death to a long prison sentence, since he would be 67 years old when he got out after 20 years and the world would have changed too much for him to make anything of himself. He did not understand why no one would take into account the things about him which were good such as his running a trucking business."

(Emphasis added.)

Seven years later, in the post-conviction proceeding—and contrary to his 1991 evaluation and conclusions—Colby testified that "it is quite possible that had a more thorough investigation of his fitness to proceed been requested and done that Mr. Pratt would have been found unfit to proceed and incapable of effectively aiding and assisting his counsel in preparation of his defense." Underwager, on the other hand, testified in the post-conviction proceeding that he believed that petitioner did have the ability to assist and cooperate with his counsel: "I had no question that he was able to assist and cooperate with the counsel. He was doing it."

Hadley, one of petitioner's criminal trial attorneys, testified at the post-conviction proceeding that it was his understanding that Colby had determined that petitioner was competent to proceed and had ruled out the likelihood that any mental disease or defect defense would have a realistic chance with the jury. The other criminal trial attorney, Bozgoz, testified at the post-conviction trial that, as far has he could remember, petitioner "understood what was going on" and insisted that "we go to trial." Bozgoz also testified that he felt that petitioner had actively participated in creating and presenting his defense.

Nevertheless, petitioner argued to the post-conviction court, as he does on appeal, that his rejection of the state's plea offer of a life sentence with the possibility of parole after 30 years so evinced his incompetence to stand trial that counsel were compelled to request and pursue a further investigation of his competence. The evidence adduced at the post-conviction trial regarding petitioner's rejection of the plea offer showed that Hadley thought the offer was a good one and advised petitioner to accept the offer. Conversely, Bozgoz stated that Hadley was probably right—but told petitioner that he (Bozgoz) would rather die than spend 30 years in prison. Petitioner, who felt more comfortable with Bozgoz than with Hadley, declined the plea offer, although Bozgoz did recommend later that petitioner accept the offer. Petitioner also presented testimony by several individuals who worked with trial counsel preparing for the 1991 trial that they believed that petitioner was mentally impaired at that time.

The post-conviction court rendered the following findings:

"23. Petitioner did assist with his defense by, among other things, directing the investigator to individuals or places that might yield testimony or evidence beneficial to his defense in the guilt phase.

"24. Petitioner did assist with his defense by, among other things, directing the investigators to people from his past who might have been able to offer mitigating evidence.

"25. The investigators' investigation of matters or people suggested by petitioner sometimes yielded favorable results.

"26. Petitioner's ability to assist his attorneys with his defense is demonstrated by his cooperation with Dr. Underwager's evaluation, in which petitioner revealed private and embarrassing information about himself.

"27. Petitioner's ability to assist in his own defense is demonstrated by petitioner's participation in decisions regarding which witnesses to call and his continued consultations with counsel, effected by petitioner's frequent telephone calls to Mr. Bozgoz's home during the trial.

"28. Petitioner's deposition testimony reveals he has a sharp memory concerning the details of his trial and pretrial investigation, which contradicts his assertion in this proceeding that he did not understand what was going on at the time.

"* * * * *

"37. Mr. Hadley discussed with petitioner at length the possibility of a plea agreement.

"38. Mr. Hadley reasonably believed that petitioner understood the plea offer and the consequence of not accepting it.

"39. Petitioner had been previously convicted of aggravated murder and sentenced to death. Petitioner understood the consequence of rejecting the state's plea offer."

Each of those findings of fact is supported by evidence in the record.

Petitioner's fundamental argument on appeal, as at the post-conviction trial, is that, regardless of the evidence supporting the post-conviction court's findings, the fact that petitioner chose to proceed to trial with the possibility of a death sentence rather than accepting the plea bargain of a life sentence with a 30-year minimum was such compelling evidence of petitioner's inability to "assist and cooperate with counsel" that trial counsel's failure to obtain an additional evaluation necessarily breached the standard of constitutionally adequate representation. Petitioner offers no legal authority for that proposition and we are aware of none.

The premise of petitioner's argument is that no competent person in petitioner's position could have made the choice that he made to proceed to trial in 1991. We respectfully disagree. At the time that petitioner rejected the plea offer, he was continuing to adamantly maintain his innocence. At that time, because of the holding in *Pratt I*, substantial evidence of prior criminal conduct that had been admitted in the guilt phase of the first trial would be inadmissible in the guilt phase on retrial. Moreover, under the plea offer, petitioner, who was then middle-aged, would have received a sentence that would have guaranteed his incarceration until very old age. Petitioner was uniquely qualified to evaluate his options: He had previously been sentenced to death and already had spent considerable time in prison. His choice was not innately irrational.

Finally, with respect to the alleged deficiencies of trial counsel, petitioner asserts that the post-conviction court erred in rejecting his claim based on trial counsel's failure to present a defense of "mental disease or defect." ORS 161.295(1).[7] As noted, before the 1991 trial, Colby examined petitioner and rendered several diagnoses, including a provisional diagnosis of "organic personality disorder, explosive type." *See* 199 Or App at 451-52. At the post-conviction trial, Hadley testified that he understood Colby to have advised that a mental disease or defect defense would not have a realistic chance in petitioner's case. Hadley also testified that one of the reasons he did not pursue a mental disease or defect defense was that he did not believe petitioner's diagnoses would support such a defense. Bozgoz similarly testified that he understood Colby to have concluded that petitioner would not likely have a viable mental disease or defect defense. He further testified that he did not think such a defense would be successful in Klamath County, given the nature of the charged crime.

Petitioner asserts on appeal that counsel were inadequate because they must have misconstrued ORS

---

[7] ORS 161.295(1) provides:

"A person is guilty except for insanity if, as a result of mental disease or defect at the time of engaging in criminal conduct, the person lacks substantial capacity either to appreciate the criminality of the conduct or to conform the conduct to the requirements of law."

161.295 to preclude the possibility of a mental disease or defect defense for petitioner, because that statute provides that "the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct, nor do they include any abnormality constituting solely a personality disorder." ORS 161.295(2). Petitioner contends that his counsel ruled out the possibility of an insanity defense on the erroneous assumption that his provisional diagnosis of an "organic personality disorder, explosive type" precluded such a defense. In support of that contention, petitioner relies on *Mueller v. PSRB*, 325 Or 332, 937 P2d 1028 (1997), in which the court concluded that "organic personality disorder" and "organic brain syndrome" are not diagnoses that fall within the "solely a personality disorder" exclusion of ORS 161.295. *Mueller*, 325 Or at 341.

Whatever the merit of petitioner's argument in the abstract, it fails for at least one concrete reason: The post-conviction court specifically found that petitioner told his trial counsel that "he did not want to assert an 'insanity' defense." Evidence in the record supports that finding. Given petitioner's instructions, counsel could not have provided inadequate assistance in failing to present such a defense. A criminal defendant cannot be found guilty but insane if he has not asserted that affirmative defense. In *State v. Peterson*, 70 Or App 333, 339, 689 P2d 985 (1984), we held that there was no authority "for the court, over a defendant's objection, to impose the defense" of "not responsible due to mental disease or defect." Although *Peterson* was decided under a prior statute, we adhered to its holding in *State v. Bozman*, 145 Or App 66, 929 P2d 1019 (1996), which, like this case, concerned ORS 161.295. It follows that, if a court cannot find a criminal defendant guilty but insane pursuant to ORS 161.295 over the defendant's objection, trial counsel cannot reasonably be expected to assert such a defense over the defendant's objection.

We have considered, and reject without discussion, petitioner's remaining arguments concerning trial counsel's performance.

Petitioner next argues that his appellate counsel in *Pratt II* provided inadequate assistance in various respects.

As an initial matter, the parties dispute the substantive standard for evaluating the adequacy of appellate counsel. As noted above, when we determine that trial counsel has not exercised reasonable professional skill and judgment, we then look to whether counsel's deficiency had "a tendency to affect the result of the criminal trial." *Stevens*, 322 Or at 110 (quoting *Trujillo*, 312 Or at 435). However, the test for actionable prejudice from inadequate assistance of appellate counsel has been formulated slightly differently: To prevail on such a claim, a petitioner "must establish (1) that competent appellate counsel would have asserted the claim, and (2) that had the claim of error been raised, it is more probable than not that the result would have been different." *Guinn v. Cupp*, 304 Or 488, 496, 747 P2d 984 (1987).

Here, petitioner asserts that the "more probable than not" standard is more stringent than the "tendency to affect" standard and that later decisions such as *Stevens* implicitly overruled that aspect of *Guinn*. Petitioner further asserts that *Guinn*'s "more probable than not" standard is more stringent than the federal Sixth Amendment test, and urges this court to adopt the federal standards. Defendant offers a comprehensive response. Although we appreciate the parties' thoughtful arguments, we need not resolve that question in this case. As explained below, regardless of the standard for assessing the potential consequences of alleged defaults by appellate counsel, we agree with the post-conviction court that the performance of appellate counsel in *Pratt II* did not breach the standard of constitutionally adequate representation.

Petitioner asserts that appellate counsel provided inadequate assistance because he failed to present federal constitutional arguments in support of several of his assignments of error in *Pratt II*. In particular, petitioner alleges that appellate counsel was deficient for having failed to raise federal constitutional arguments in support of assignments of error in *Pratt II* that challenged (1) the trial court's denial of a motion for mistrial based on the content of a note from the jury during guilt phase deliberations; (2) its denial of a motion for mistrial after a witness in the penalty phase referred to petitioner having been on death row; (3) its denial of a motion for mistrial based on an alternate juror's

remarks; and (4) a jury instruction on the meaning of "beyond a reasonable doubt." We address each specification in turn.

■       Petitioner first asserts that, in an assignment of error pertaining to a note sent to the judge by the jury, appellate counsel in *Pratt II* should have made numerous arguments under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. We briefly recount the relevant circumstances. During jury deliberations in the guilt phase of the trial, the jury sent the court a note, stating, "Why is this the second trial? Would you give us an exact reason." Trial counsel moved for mistrial, citing a case identified only as *"Williams"*[8] for the proposition that "nothing could be more damning to an accused" than the jury's knowledge of a prior trial and conviction. The court responded that it was denying the motion based on *Patton v. Yount*, 467 US 1025, 104 S Ct 2885, 81 L Ed 2d 847 (1984), and *"State v. Cole."*[9] Trial counsel replied that he believed *Patton* and *"Cole"* supported his position. The court subsequently gave a cautionary instruction telling the jury that its inquiry was "not material to your decision in this case[.]" On appeal, counsel assigned error to the court's denial of the motion for mistrial, citing only Oregon authority for the proposition that the court committed reversible error, and making no reference to any of the cases cited to the trial court. The Oregon Supreme Court rejected that assignment of error:

> "[T]he jury's question did not necessarily mean that the jury was considering extraneous information. The jury could have deduced from various factors, including references to prior testimony, that this was defendant's second trial. Furthermore, the trial court acted swiftly to rectify any possible prejudice to defendant by instructing the jury to consider only the evidence produced during this trial and the court's instructions."

*Pratt II*, 316 Or at 578.

In seeking post-conviction relief, petitioner asserted that appellate counsel in *Pratt II* provided inadequate

---

[8] That case has not been identified more precisely to us in the present appeal.

[9] Again, that case has not been identified more precisely to us in the present appeal.

assistance by failing to raise federal constitutional arguments in support of the assignment of error pertaining to the denial of the "mistrial requested by the defense for juror misconduct after the jury during deliberations sent a note to the court[.]" The post-conviction court made the following findings pertinent to petitioner's argument:

"88. Petitioner did not establish the jury impermissibly considered extraneous information during their deliberations.

"89. Counsel made thorough arguments in favor of the assignments of error raised on appeal. Appellate counsel covered the issues necessary for an adequate appeal.

"* * * * *

"92. Appellate counsel reasonably did not advance arguments on appeal that were not advanced at petitioner's trial.

"93. Petitioner's allegations that appellate counsel made inadequate arguments concerning issues raised * * * when the jury sent out a note during the guilt-phase deliberations * * * are based on an unsupported assertion that the jury considered extraneous information in reaching their verdicts. Because no evidence establishes the jury considered extraneous information in reaching their verdict, appellate counsel reasonably did not include multiple citations to federal cases discussing the [e]ffect of the jury's consideration of extraneous information."

On appeal, petitioner argues that "[o]btaining information outside the courtroom mid-trial and not reporting the matter, contrary to the court's instructions, violates several constitutional guarantees." He cites cases standing for the proposition that such a situation could violate a criminal defendant's right to confront witnesses, the right to be present at trial, and the right to counsel. He further asserts that he had a due process right to have the trial court conduct an inquiry to determine whether the jurors had been exposed to extrinsic material.

Petitioner's arguments lose sight of the narrow issue that was before the post-conviction court: What authority would constitutionally adequate appellate counsel have raised in support of an assignment of error pertaining to

whether a mistrial should have been granted after the jury sent the note? To the extent that petitioner is now arguing that appellate counsel should have assigned error to the trial court's failure to question the jurors, that argument necessarily fails. Petitioner's allegation in his petition for post-conviction relief, and the post-conviction court's ruling, concerned whether certain *arguments* should have been made by appellate counsel concerning the denial of a mistrial motion, not whether appellate counsel should have *assigned error* to the trial court's failure to question jurors. Thus, some of petitioner's arguments to us pertain to a matter that is beyond the scope of his post-conviction pleadings and his assignment of error in this appeal. We reject those arguments without further discussion.

Petitioner's remaining arguments pertaining to the briefing of the "jury note" matter in *Pratt II* are, for the most part, based on his assumption that the jury obtained and considered "outside information" that prompted it to send the note. However, as indicated above, the Oregon Supreme Court, in evaluating the record on direct review, concluded that "the jury's question did *not* necessarily mean that the jury was considering extraneous information." *Pratt II*, 316 Or at 578 (emphasis added). To the contrary—and not surprisingly, given that petitioner did not adduce any evidence in the post-conviction proceeding that the jury's note was, in fact, prompted by its consideration of outside information— the post-conviction court found that petitioner "did not establish [that] the jury impermissibly considered extraneous information during [its] deliberation." Accordingly, petitioner's arguments rest on an unsubstantiated premise.

■     Finally, except in extraordinary circumstances, appellate counsel's failure to raise unpreserved matters does not, and cannot, constitute inadequate assistance.[10] *Cf. Blackledge v. Morrow*, 174 Or App 566, 571, 26 P3d 851, *rev den*, 332 Or 558 (2001) (counsel did not provide inadequate assistance for failing to raise an issue on appeal that would not have been reviewable). Rather, petitioner's appellate

---

[10] Exceptions might involve errors "apparent on the face of the record" or errors of jurisdictional significance, neither of which is asserted here.

counsel could reasonably raise only those contentions that had been preserved in the trial court.

Here, as noted, trial counsel referred to three cases during the 1991 colloquy on the mistrial motion. However, in seeking post-conviction relief, petitioner offers no cogent explanation as to how or why criminal trial counsel's reference to any of those cases should plausibly have preserved the contentions, based on federal constitutional law, that petitioner now asserts that appellate counsel in *Pratt II* was deficient in failing to have raised. Indeed, as noted, *see* 199 Or App at 465, nn 8 & 9, petitioner's brief in this appeal does not even identify *"Williams"* or *"State v. Cole"* in such a way that we can tell what cases were being cited, much less their relevance to the issue presented here. With respect to *Patton*, the third case referred to in the 1991 colloquy, petitioner does not even cite *Patton* in the present appeal. Nor does he make any arguments that relate in any discernible way to the arguments considered in *Patton*.[11]

■   In sum, petitioner's appellate counsel in *Pratt II* reasonably did not raise the federal constitutional contentions that petitioner now asserts should have been advanced in support of the "jury note"/denial of mistrial assignment of error. Those arguments were either unpreserved, or are based on factual assumptions not borne out by the record, or both.[12]

Petitioner makes a closely related claim that appellate counsel in *Pratt II* was deficient because he did not make

---

[11] In *Patton*, the Court considered whether, given extensive publicity that had surrounded a prosecution, the petitioner's Sixth Amendment rights to an impartial jury were violated. The analysis in the case related solely to whether the jurors were properly seated, in light of the petitioner's challenges for cause. 467 US at 1036. The emphasis of the analysis was on *voir dire* of the jurors, the vast majority of whom were aware of the case. *Id.* at 1029, 1038-39. The Court concluded that the jury was properly empaneled, even though some jurors had indicated that they had formed opinions about the case. *Id.* at 1032-33, 1040. Nothing in *Patton* pertained to a mistrial.

[12] Petitioner asserts that, regardless of whether those arguments were raised and preserved at trial, they were raised in a post-trial motion for a new trial. The state responds, and we agree, that a motion for mistrial and arguments in support of such a motion must be made contemporaneously with the asserted error in order to preserve the issue for appeal. *See, e.g., State v. Barone*, 329 Or 210, 236 n 19, 986 P2d 5 (1999), *cert den*, 528 US 1086 (2000); *State v. Williams*, 322 Or 620, 631, 912 P2d 364, *cert den*, 519 US 854 (1996).

a federal constitutional argument in his assignment of error concerning the trial court's failure to grant a mistrial when a witness during the penalty phase referred to the fact that petitioner previously had been on death row. Again, as with the "jury note" matter, the Oregon Supreme Court held on direct review that the trial court did not abuse its discretion in denying the motion for a mistrial based on the reference. *Pratt II,* 316 Or at 583. Petitioner's claim fails for the same reasons cited above concerning the denial of the other mistrial motion: To the extent that petitioner preserved any federal constitutional argument, it was by way of cross-referencing the arguments made earlier in relation to the denial of the mistrial motion described above, including a reference to *Patton.* Appellate counsel reasonably did not advance an argument based on *Patton* because that case was, factually and legally, materially distinguishable.

Petitioner next argues that appellate counsel was inadequate for failing to make federal constitutional arguments in support of his assignment of error challenging the denial of yet another motion for a mistrial based on comments made by an alternate juror during trial. Again, on direct review, the Oregon Supreme Court rejected that assignment of error, concluding that the trial court had not abused its discretion in denying the mistrial motion. *Pratt II,* 316 Or at 574-75. Again, appellate counsel reasonably did not contend that the failure to grant a mistrial based on misconduct by the alternate juror violated petitioner's federal constitutional rights because trial counsel did not raise and preserve such a contention. *See State v. Baker,* 154 Or App 358, 363 n 2, 961 P2d 913, *rev den,* 327 Or 553 (1998) (where argument in trial court was framed exclusively in terms of the Oregon Constitution, court would not consider for the first time on appeal an argument under the United States Constitution).

Finally, petitioner contends that appellate counsel in *Pratt II* provided inadequate assistance by failing to assert federal constitutional arguments in relation to his assignment of error concerning a jury instruction on the meaning of "beyond a reasonable doubt." Appellate counsel did, in fact, advance certain federal constitutional arguments in support of that assignment of error, and the Oregon Supreme Court

rejected them. *Pratt*, 316 Or at 576-77, 577 n 11. Petitioner asserts that counsel should have raised additional and qualitatively different federal constitutional contentions. However, once again, petitioner's trial counsel did not raise and preserve the contentions that petitioner now asserts that appellate counsel should have advanced on review. The post-conviction court correctly determined that appellate counsel's failure to raise unpreserved federal constitutional contentions did not constitute inadequate assistance of counsel.

The post-conviction trial court properly denied post-conviction relief.

Affirmed.